No. 98-133

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 278

KATHE CAMPBELL and KEN CAMPBELL,

Plaintiffs and Appellants,

v.

C.R. CANTY, M.D.,

Defendant and Respondent.

APPEAL FROM: District Court of the Second Judicial District,

In and for the County of Silver Bow,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:


For Appellants:


Michael J. Milodragovich, Milodragovich, Dale, Steinbrenner & Binney, Missoula, Montana


For Respondent:


E. Craig Daue, Garlington, Lohn & Robinson, Missoula, Montana


Submitted on Briefs: August 27, 1998


Decided: November 12, 1998

Filed:


_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1. Kathe Campbell (Kathe) was initially treated by Dr. Charles R. Canty (Dr. Canty) after she was severely bitten by a donkey. Kathe and her husband, Ken, (collectively referred to as "the Campbells") filed a complaint against Dr. Canty alleging negligence in his care and treatment of Kathe. Trial was held in the District Court for the Second Judicial District, Silver Bow County, wherein the jury found that although Dr. Canty was negligent in his care of Kathe, Dr. Canty's negligence did not cause injury to Kathe. We affirm.

¶2. The Campbells raise the following issues on appeal:

¶3. 1. Whether the evidence at trial established that Dr. Canty's negligence subjected Kathe to an increased risk of harm and lessened her chances for a better result thereby causing damage to Kathe.

¶4. 2. Whether the District Court erred in denying the Campbells' motion to alter or amend the judgment and for a new trial.

### Factual and Procedural Background

¶5. The Campbells own and operate a small ranch outside Butte. On May 30, 1993, Ken Campbell (Ken) had just returned home from the hospital after major surgery, thus Kathe set out on her own to attend to the ranch chores. When she attempted to repair a fence where one of their donkeys was corralled, the animal attacked her. The donkey knocked Kathe to the ground and pinned her there with the weight of his body. Her left arm was trapped beneath her, but her right arm was exposed. The donkey savagely and repeatedly bit Kathe on her right forearm before she was able to free her left arm and fend him off. Kathe managed to make it to the door of their house where Ken found her and called an ambulance.

¶6. Kathe was taken to St. James Community Hospital in Butte. The donkey's bites

had crushed the bones in Kathe's forearm and had caused shearing, crushing and tearing of the skin, muscles, veins and nerves in her arm. Extensive amounts of tissue, muscle and nerves were destroyed by the bites.

¶7. Dr. Canty was the orthopedic surgeon on call when Kathe was brought to the hospital. After treatment by emergency room personnel to stabilize her vital signs, Kathe was transferred to Dr. Canty's care. Dr. Canty, after examining the injury, informed Kathe and her family that there was a possibility that amputation would be necessary. Kathe asked Dr. Canty to save her arm.

¶8. In the initial surgery, Dr. Canty inserted a metal rod into the large bone in Kathe's forearm. He cleaned the wound removing dead or dying tissue and muscle along with debris deposited in the wound from the donkey's mouth. Dr. Canty noted that the ulnar artery in Kathe's arm was injured and bruised, but the radial artery, although also bruised, was intact. He traced the radial artery to make sure that blood was flowing through the site of the injury and beyond.

¶9. In a second surgery approximately 68 hours later, Dr. Canty again cleaned the wound and removed more dead and dying tissue and muscle. He noted at that time that the ulnar artery was still bruised and, while it was pulsing a little, it was not acting as a major circulatory link to the hand. He also noted that the radial artery was still functioning and that there was a pulse through the site of the injury leading him to believe that blood was still flowing through the injured forearm to the hand.

¶10. Kathe's family became dissatisfied with Dr. Canty's treatment of Kathe as they began to realize that the condition of Kathe's hand was slowly deteriorating. Hence, they took Kathe to Billings to be cared for by Dr. Curtis Settergren. Dr. Settergren is a board certified orthopedic surgeon with an additional qualification in hand surgery. He performed a number of surgeries on Kathe including a vein graft to bypass the injured artery and to allow blood to flow past the injured portion of the arm to the hand. While Kathe's fingers initially responded to the increased blood flow from the bypass, the tissue in her fingers and hand began to die resulting in the amputation of Kathe's arm below the elbow.

¶11. On June 12, 1995, the Campbells filed a complaint against Dr. Canty and St. James Community Hospital alleging that Dr. Canty was negligent in his care and treatment of Kathe. In their complaint, the Campbells alleged that Dr. Canty was

negligent in failing to recognize the occlusion of the radial artery; failing to conduct or order objective testing of the blood flow to and from Kathe's hand; and failing to consult with a vascular surgeon about performing a vein graft to bypass the injured portion of Kathe's arm to allow blood to flow to Kathe's hand which still had some viability. The Campbells also alleged that St. James Community Hospital was negligent in failing to independently monitor the adequacy of the care Kathe received. The hospital was subsequently dismissed from the suit with prejudice.

¶12. The case was tried to a jury on October 20 through 24, 1997. The jury was instructed to consider whether Dr. Canty was negligent in his care of Kathe and, if so, whether Dr. Canty's negligence caused an increased risk of harm to Kathe and/or reduced her chance for obtaining a better result. The jury found Dr. Canty negligent (without specifying what particular aspect of his care was negligent), however, they found that Dr. Canty's negligence did not cause Kathe to suffer injury.

¶13. On November 13, 1997, the Campbells filed a "Motion to Alter or Amend Judgment Regarding Issue of Causation and for Partial New Trial Regarding Issue of Damages." In that motion, the Campbells requested that the District Court enter an order notwithstanding the verdict that Dr. Canty's negligence had caused the Campbells to suffer damages. The Campbells also requested that the District Court order a partial new trial limited solely to the issue of damages sustained by the Campbells.

¶14. The District Court issued its order denying the Campbells' motion on January 8, 1998. The court concluded that it was within the province of the jury to find negligence but no causation of damages from that negligence. The Campbells appealed contending that the uncontroverted evidence at trial established that Dr. Canty's negligence caused Kathe damages because his negligence subjected her to an increased risk of harm and as a result she lost a chance for a better result.

## Issue 1.

¶15. *Whether the evidence at trial established that Dr. Canty's negligence subjected Kathe to an increased risk of harm and lessened her chances for a better result thereby causing damage to Kathe.*

¶16. The jury rendered a verdict that Dr. Canty was negligent in his care of Kathe but that this negligence did not cause injury to Kathe. The Campbells argue on appeal that the jury impermissibly disregarded uncontroverted, credible evidence that Dr. Canty breached his duty of care to Kathe causing compensable injury. The Campbells contend that the jury failed to follow the instructed law of the case and rendered a verdict that was not in accord with the evidence presented, thereby rendering a verdict that was contrary to law.

¶17. In reviewing a jury verdict, we do not decide whether the verdict was correct or whether the jury made the right decision. *Wise v. Ford Motor Co.* (1997), 284 Mont. 336, 343, 943 P.2d 1310, 1314. We only review whether there is substantial credible evidence in the record to support the jury's verdict. *Wise,* 284 Mont. at 343, 943 P.2d at 1314. *See also C. Haydon Ltd. v. MT Min. Properties, Inc.* (1997), 286 Mont. 138, 151, 951 P.2d 46, 54; *Tanner v. Dream Island, Inc.* (1996), 275 Mont. 414, 422, 913 P.2d 641, 646; *Barthule v. Karman* (1994), 268 Mont. 477, 485, 886 P.2d 971, 976; *Rocky Mountain Ent. v. Pierce Flooring* (1997), 286 Mont. 282, 295, 951 P.2d 1326, 1334.

¶18. We have previously stated that substantial evidence is that evidence that a reasonable mind might accept as adequate to support a conclusion. *Haydon*, 286 Mont. at 151, 951 P.2d at 54 (citing *Baird v. Norwest Bank* (1992), 255 Mont. 317, 323, 843 P.2d 327, 331). Moreover, substantial evidence consists of more than a mere scintilla of evidence, but may be less than a preponderance of evidence, and, although it may be based on weak and conflicting evidence, in order to rise to the level of substantial evidence, it must be greater than trifling or frivolous. *Haydon*, 286 Mont. at 151, 951 P.2d at 54.

¶19. An attack upon a jury verdict as not supported by the evidence is proper only when there is a complete absence of any credible evidence in support of the verdict. All evidence and all inferences drawn therefrom must be considered in a light most favorable to the adverse party. *Haydon*, 286 Mont. at 151, 951 P.2d at 54 (citing *Lackey v. Wilson* (1983), 205 Mont. 476, 479, 668 P.2d 1051, 1053). Furthermore, if conflicting evidence exists, the credibility and weight given to the evidence is in the jury's province and we will not disturb the jury's findings unless they are inherently impossible to believe. *Wise,* 284 Mont. at 339, 943 P.2d at 1312 (citing *Okland v. Wolf* (1993), 258 Mont. 35, 39, 850 P.2d 302, 305; *Silvis through Silvis v. Hobbs* (1992), 251 Mont. 407, 411-12, 824 P.2d 1013, 1015-16).

¶20. The Campbells argue that the evidence on causation was uncontroverted. They assert that their expert witness, Dr. Kenneth Wilson, a board-certified orthopedic surgeon with an added qualification in hand surgery, firmly established that Dr. Canty's negligence in failing to perform a bypass, or in failing to contact a vascular surgeon to perform a bypass, lessened Kathe's chances of obtaining a better result and caused Kathe to endure numerous surgeries which increased her risk of harm.

¶21. Contrary to the Campbells' assertions, Dr. Wilson's testimony on causation was contradicted by Dr. Canty's expert witness, Dr. Stephen Sears, who is board certified in orthopedic surgery, by Dr. Settergren and by Dr. Canty. Dr. Sears, Dr. Settergren and Dr. Canty testified that the damage to Kathe's forearm from the bites was so extensive, Kathe's chances of keeping her arm were minimal. They also testified that Kathe was forced to endure numerous surgeries, not because of Dr. Canty's negligence, but because of the continuing need to treat the extensive trauma to Kathe's forearm.

¶22. Dr. Settergren whose testimony was preserved through a videotape which was shown to the jury during trial, testified that the purpose of the bypass was to carry blood and oxygen to the wrist and hand and that it would not have had any significant affect on the massive trauma to the forearm. He also testified that multiple surgeries were necessary because he continually had to remove tissue and muscle from the bite area and, even if the bypass had been successful in saving Kathe's hand, she still would have lost a substantial amount of tissue and muscle in the area of the massive trauma on her forearm.

¶23. Although Dr. Settergren stated that there was a "chance" that the tissues of the fingers could have been preserved had the bypass been done sooner, he testified as follows at the close of his deposition:

Q. Doctor, as a general rule, when you are considering the need for amputation on an arm, do you try to amputate as far out on the arm as possible?

A. As a general rule.

Q. And in Mrs. Campbell's case, if the only, if the loss of tissue in her hand was the only reason for amputation, would you have amputated say, down at the wrist?

A. As far distal as I could.

Q. Yes. And is it fair to say that the reason in this case that she has an amputation below the elbow is because of the massive tissue loss in the upper forearm from the bite?

A. Well, I chose my level by what I could cover it with. The longer level, the more tissue you need to cover it-- and I didn't have, you know-- I left it as long as I could and still cover the wound.

Q. You did what the injury would allow and what you had left over to work with?

A. Yeah, what viable tissue I had to cover the bone with.

**¶24. Furthermore, while Dr. Wilson testified that there was a 90 to 95% chance that Kathe "would have had a very functional extremity," Dr. Settergren testified that he told Kathe from the beginning that with the extensive damage to the muscles and nerves in her forearm caused by the bite, the tissue could be preserved but "function could be little more than a paperweight."**

**¶25. In like manner, Dr. Sears testified that, although he did not disagree with Dr. Wilson's statement that Kathe lost her hand because of the failure of the radial artery to perfuse and nourish the hand, amputations are generally performed as far out on the arm as possible and if Kathe's only problem had been a lack of circulation through the radial and/or ulnar arteries into the hand, the amputation would have been at the wrist, not below the elbow. Additionally, Dr. Sears stated that in an injury such as Kathe's, there is every reason to expect that there would be continuing tissue loss after the time of the first surgery. He explained that because of the shearing action in the bite, the skin was pulled loose in places from the nerves and veins causing the surrounding tissue to die off. He noted that even after Kathe transferred to Billings, there continued to be tissue death in the forearm making it necessary for Dr. Settergren to perform multiple surgeries on Kathe's arm to remove this dead and dying tissue.**

**¶26. Dr. Sears further testified that the bypass eventually performed by Dr. Settergren was not designed to help the tissue in the forearm as the artery that feeds that tissue branches off above the elbow into smaller arteries and those arteries**

weren't damaged. He stated that the damage at the wound was not coming from a lack of blood, but from the bite trauma itself.

¶27. Dr. Canty testified that he was dubious about Kathe's chances with bypass surgery as there has to be tissue that is capable of accepting the blood brought in by the bypass as well as a means available for the blood to flow back out. He stated that he did not believe that was the situation in Kathe's case because of the massive trauma to her forearm.

¶28. By the same token, contrary to Dr. Wilson's opinion that waiting almost 72 hours to perform the second surgery increased the risk of infection and lessened Kathe's chances for a better result, Dr. Sears testified that the delay in this case was appropriate. He stated that the standard time for a second debridement and closure of the wound is three to five days depending on the magnitude of the wound. Dr. Sears explained that the reason a doctor waits to close a wound of this type is that when a wound is contaminated as in a bite, the bacteria grows faster if the wound is covered. If the wound is left open, it stays cleaner and there is less tissue to debride the second time. He stated that the "ideal thing is, when you go back in three days, if it looks good, you can close it safely; whereas if I close it on the date of the injury, your infection rate goes up dramatically." Indeed, Dr. Settergren testified that the two debridements performed by Dr. Canty were adequate as there were no signs of infection when Dr. Settergren first examined Kathe's injury.

¶29. In summary, much of the testimony on causation of the Campbells' expert witness, Dr. Wilson, was contradicted by Dr. Sears, Dr. Settergren and by Dr. Canty. Indeed, while Dr. Wilson testified that the amputation of Campbell's hand was a direct result of not having the artery bypassed earlier, both Dr. Sears and Dr. Settergren testified that if Campbell's only problem had been a lack of circulation through the arteries into the hand, the amputation would have been closer to the wrist and not below the elbow. The evidence supports the finding that Kathe's wound was so devastating that, even if the bypass had been done earlier, it would not have prevented amputation, thus, the jury could legitimately conclude that Dr. Canty's negligence did not lessen Kathe's chance for obtaining a better result.

¶30. Furthermore, the evidence also supports a finding that the numerous surgeries Kathe endured were not intended to salvage Dr. Canty's negligence, but instead, were a last-ditch attempt to accomplish a result that was doomed from the beginning

to fail because of the devastation of the original injury. Thus, the jury could legitimately conclude that Dr. Canty's negligence did not cause Kathe to suffer an increased risk of harm.

¶31. While conflicting evidence does exist in this case regarding whether Dr. Canty's negligence caused injury to Kathe, as we stated elsewhere in this opinion, the credibility and weight given to that evidence is in the jury's province. *Wise*, 284 Mont. at 339, 943 P.2d at 1312. Thus, since we conclude that the jury's findings are not ''inherently impossible to believe,'' we will not disturb those findings. *Wise*, 284 Mont. at 339, 943 P.2d at 1312. Moreover, considering all of the evidence and all inferences that may be drawn therefrom in a light most favorable to Dr. Canty, as we are constrained to do, we hold that there is substantial credible evidence in the record to support the jury's verdict.

¶32. Accordingly, we uphold the jury verdict in this case and we affirm the judgment of the District Court.

Issue 2.

¶33. *Whether the District Court erred in denying the Campbells' motion to alter or amend the judgment and for a new trial.*

¶34. After the jury rendered its verdict in this case and the District Court had entered its judgment on that verdict, the Campbells filed a motion to alter or amend the judgment, pursuant to Rule 59(g), M.R.Civ.P., regarding the issue of causation and a motion for a new trial, pursuant to Rule 59(a), M.R.Civ.P., regarding the issue of damages. The Campbells contended that the jury impermissibly disregarded the substantial and uncontested evidence presented at trial and that they failed to follow the law of the case. The District Court denied the Campbells' motion stating that it was within the province of the jury to listen to and evaluate the demeanor and credibility of the witnesses and that the court would not second guess the deliberations and decision of the jury.

¶35. The amendment of a judgment is within the discretion of a district court, thus we review a court's grant or denial of a motion to amend for an abuse of discretion. *Bevacqua v. Union Pacific R. Co.*, 1998 MT 120, ¶ 36, 960 P.2d 273, ¶ 36, 55 St.Rep.

469, ¶ 36 (citing *Estate of Nielsen v. Pardis* (1994), 265 Mont. 470, 478, 878 P.2d 234, 238). An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason resulting in substantial injustice. *Tanner*, 275 Mont. at 430, 913 P.2d at 651 (citing *Investigative Records of City of Columbus Pol. Dept.* (1995), 272 Mont. 486, 488, 901 P.2d 565, 567).

¶36. In addition, the decision to grant or deny a new trial is within the sound discretion of the trial judge and we will not disturb that decision absent a showing of manifest abuse of that discretion. *Durden v. Hydro Flame Corp.*, 1998 MT 47, ¶ 30, 955 P.2d 160, ¶ 30, 55 St.Rep. 198, ¶ 30 (citing *Jim's Excavating Service v. HKM Assoc.* (1994), 265 Mont. 494, 512, 878 P.2d 248, 259).

¶37. The Campbells contend on appeal that, in view of the "uncontested" evidence, the jury's verdict in this case clearly mandated the District Court to grant their request to amend the judgment finding that Dr. Canty's negligence caused the Campbells to suffer damages and to order a new trial to determine the amount of those damages. Contrary to the Campbells' contentions, the evidence on causation was not "uncontested" as our discussion in the previous issue demonstrated. Moreover, the District Court was correct in concluding that it is within the province of the jury to listen to and evaluate the demeanor and credibility of the witnesses. *Wise*, 284 Mont. at 339, 943 P.2d at 1312.

¶38. There being no indication that the District Court "acted arbitrarily without conscientious judgment" or that the court exceeded "the bounds of reason resulting in substantial injustice," *Tanner,* 275 Mont. at 430, 913 P.2d at 651, we conclude that the District Court did not abuse its discretion in denying the Campbells' motion to alter or amend the judgment or for a new trial.

¶39. Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

Justice Terry N. Trieweiler dissenting.

**¶40. I dissent from the majority's conclusion that there was substantial evidence to support the jury's verdict that the defendant's negligence did not cause damage to the plaintiffs.**

**¶41. The District Court correctly instructed the jury that "[a] doctor's negligence is a cause of damage to the plaintiff if it causes increased risk of harm to the plaintiff or reduces his chance for obtaining a better result." Montana Pattern Jury Instruction (Civil) 3.11; *Aasheim v. Humberger* (1985), 215 Mont. 127, 132, 695 P.2d 824, 827-28.**

**¶42. Plaintiffs contended that the defendant, C.R. Canty, M.D., was negligent by failing to adequately diagnose impairment to the blood flow through Kathe Campbell's radial artery, and by failing to consult a specialist so that the necessary circulation of blood to her injured hand could be restored.**

**¶43. The evidence was that her medical records disclosed impairment to that blood flow by mid-day, June 2, 1993, but that other than arranging for her transfer to Billings, nothing was done by Dr. Canty to treat that impairment, and that it was first treated by Curtis R. Settergren, M.D., more than thirty hours later. It was uncontroverted that human tissue which is denied blood for as little as four to six hours cannot survive.**

**¶44. Furthermore, Dr. Kenneth Wilson gave the following testimony:**

Q. [APPELLANTS' COUNSEL] Is it adequate orthopedic surgical care to simply allow the hand to remain there untreated when there's suboptimal blood flow to the hand?

A. That's just not acceptable.

No

Q. Would you explain why?

A. Well, if there's suboptimal flow and you don't monitor it, there's a high likelihood that the hand's going to die.

Q. Does that high likelihood increase the opportunity for increased risk to the patient; in other words, a more severe outcome could happen to the patient?

A. No question about it.

Q. Does it -- does that same problem yield a greater likelihood of having a poorer result of the hospitalization and treatment?

A. Yes.

. . . .

Q. And what effect did that have on Kathe Campbell's ability to obtain a good result during her care under Dr. Canty at St. James Community Hospital?

A. That was the major reason she ended up with a bad result.

Q. Did that failure to call in other doctors or to do the graft result in an increased chance of

No

risk to Kathe Campbell, in your opinion?

A. Definitely.

Q. And did it also heighten the probability that she would get a worse result?

A. Yes.

. . . .

Q. Now, with respect to those percentages, whether it was a 75 percent chance of a likely outcome or a 90 percent chance of a likely outcome, is it still your testimony that the likelihood of a successful outcome was reduced or eliminated by the failure to deal with the circulatory emergency that Kathe had?

A. That's correct.

Q. And was it similarly reduced or eliminated by the failure to recognize that circulation emergency?

A. Yes.

Q. And similarly, was the likelihood of a successful outcome reduced or eliminated by the failure to monitor and to test objectively, to have orders given that would have someone do that?

No

A. Yes.

Q. Were those percentages similarly reduced by the failure to have some kind of handy access through the fixed fiberglass cast so that testing could, in fact, be done?

A. Yes.

Q. Did that reduction in the percentage of successful outcome indicate a higher probability of harm to Kathe Campbell as a result of those inactions that I've just listed off?

A. Most definitely.

**¶45. Only three other physicians testified, Dr. Canty and Dr. Settergren, and Dr. Canty's retained expert, Stephen R. Sears, M.D.**

**¶46. Dr. Canty did not testify directly on the issue of causation, as characterized by the District Court's instruction. Neither did Dr. Sears. Nor is direct testimony from either witness on that issue cited in the majority opinion.**

**¶47. Dr. Settergren's testimony is, at best, inconsistent regarding the issue of causation. At one point, when asked if an earlier bypass would have increased the likelihood of full revascularization to Kathe's extremity, he testified that he could not say the outcome would have been different. However, that testimony did not, in substance, directly contradict the testimony on causation given by Dr. Wilson. He did testify that had Kathe's arm been saved, it would have been substantially impaired. However, that is not the equivalent of testifying that she suffered no damage by the defendant's failure to timely diagnose and treat her obstructed radial artery. Few would disagree that a substantially impaired extremity is better than no extremity.**

¶48. At another point in his testimony, however, Dr. Settergren testified that it was possible, although he could not testify that it was probable, that an amputation could have been avoided by more timely vascular treatment, and at a later point in his testimony he stated more specifically that had the bypass been done closer in time to the circulatory failure to assure better flow of blood to Kathe's fingers, there was a chance that the tissues of the fingers could have been preserved.

¶49. Furthermore, everything about the course of Dr. Settergren's treatment suggests that Kathe had a chance of successful treatment, had that treatment been timely. By the time she arrived in Billings, he stated that her hand had become ischemic, which meant that there was inadequate blood flow to maintain the tissue at that location. Nevertheless, even at that point, with partial necrosis of the hand apparent, he felt it was worth a try to revascularize the hand by using a bypass from the proximal radial artery (toward the elbow) to the distal artery (in the direction of her hand). He felt that some circulation could be reestablished to the hand by bypassing the area of the artery that had been injured. Dr. Settergren testified that he would not have done a bypass procedure of that type unless there was a possibility of retaining the appendage. However, everyone agreed that the longer circulation is cut off to a part of the body, the less likely it is that the life of the tissue at that location can be salvaged.

¶50. The jury found that the defendant was negligent and, therefore, necessarily found that he should have diagnosed the impairment to Kathe's circulation sooner and referred her for treatment. Based on the uncontroverted evidence regarding causation, the jury could not have found that a delay in that treatment did not at least reduce Kathe's chance for obtaining a better result. She was required to prove nothing more.

¶51. Contrary to the implication from the majority opinion, the issue in this case was not why Dr. Settergren amputated at the level where he did, nor the degree of function that Kathe would have had in her hand, had it been saved by timely restoration of circulation. Nor was it Kathe's contention, as suggested in the majority opinion, that lack of circulation through the radial and ulnar arteries was her only problem. Although damage to the forearm may have contributed to the level of amputation, it was Kathe's contention that her hand was salvageable and that the amputation would not have been necessary, had her hand received timely restoration

of circulation.

¶52. Finally, Dr. Canty's testimony that he was dubious about Kathe's chances of successful bypass surgery did not directly address the issue of causation. He was discussing his state of mind before impairment to circulation through the radial artery had even been diagnosed, and his opinion did not even directly relate to Kathe's hand, but instead related to the condition of her forearm. Furthermore, however Dr. Canty's observation is characterized, it was not an opinion expressed in terms of medical probability, nor did it in any other way discuss the issue of causation, as it was defined by the court. Nothing cited in the majority opinion contradicts Dr. Wilson's testimony regarding causation.

¶53. For these reasons, I dissent from the majority opinion. After thoroughly reviewing the testimony of all medical witnesses, I conclude that there was no evidence to contradict the testimony of Dr. Wilson that the negligence of the defendant reduced Kathe Campbell's chance for obtaining a better result. Furthermore, all of the medical principles agreed upon by the expert witnesses lead to the inevitable conclusion that the failure to treat Kathe's loss of circulation to the then viable tissue in her hand in a timely manner led to its necrosis and the ultimate need for the amputation of her arm.

/S/ TERRY N. TRIEWEILER