DA 08-0546

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 319

D.R. FOUR BEAT ALLIANCE, LLC; DR FOUR
BEAT ENERGY CORP., a body corporate
registered to do business in the Province of Alberta;
and MICHAEL SIEMER,

      Plaintiffs and Appellees,

  v.

SIERRA PRODUCTION COMPANY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Ninth Judicial District,
                 In and For the County of Toole, Cause No. DV 2005-073
                 Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Jason T. Holden, Faure Holden, Great Falls, Montana

           Douglas C. Allen, Attorney at Law, Shelby, Montana

      For Appellee:

           Mark D. Parker, Parker, Heitz & Cosgrove, PLLC, Billings, Montana

           Donald L. Harris, Harman, Warren & Harris, PLLP, Billings, Montana

                        Submitted on Briefs:  July 29, 2009

                                    Decided:  September 29, 2009

Filed:

        _____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Sierra Production Company (Sierra) appeals from a jury verdict which in part awarded $2.5 million dollars in damages to plaintiff D.R. Four Beat Alliance (Four Beat) for a breach of contract claim. Sierra argues that the $2.5 million dollar verdict should be reversed because it is not supported by substantial evidence. We reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      Michael Siemer (Siemer) and Gary McDermott (McDermott) had previously conducted business dealings together in the 1980's. In July 2000, they crossed paths again when both were vacationing near West Glacier, Montana. During the course of subsequent conversations, Siemer and McDermott discussed business prospects involving oil and gas development of which McDermott was aware around Shelby, Montana. Siemer had recently made a profit of roughly $3 million dollars from business ventures in Florida, and was looking for a way to make investments in an effort to avoid tax liability and pursue new business opportunities. McDermott was a certified public accountant who was knowledgeable in oil and gas development. McDermott mentioned to Siemer that one of his clients, William M. Fulton (Bill Fulton) had a potential business opportunity developing oil and gas on lands owned by his company, Fulton Fuel Company (Fulton Fuel), in the Shelby area.

¶3      After touring oil and gas properties in the Shelby area and meeting Bill Fulton, Siemer decided to go into business with McDermott. Siemer retained a Montana attorney who was knowledgeable in oil and gas development issues to advise him concerning

2

potential projects in Montana. Siemer and McDermott entered into an Exploration Agreement (Agreement) dated December 1, 2000. The parties to the Agreement are Four Beat, owned by Siemer, MCR Partnership (MCR), owned by McDermott, and Sierra, a Nevada corporation formed on November 1, 2000, and owned entirely by the Stephco Trust, of which McDermott is a trustee.

¶4      Under the Agreement, Sierra, at the direction of McDermott, was responsible for locating and developing one or more prospects for the acquisition or development of oil and gas. Each prospect was to be considered a separate joint business venture, or JIB, and Four Beat and MCR, as "participants" to the Agreement, would have the option to participate in a given JIB under the terms of the Agreement. The Agreement had a 2-year period within which business interests could be acquired (hereinafter "the acquisition period"). The acquisition period ran from December 1, 2000, to December 1, 2002. Pursuant to the Agreement, each participant's ownership interest in a JIB would be proportional to the amount that participant invested until "payout" on that JIB was achieved. Under the Agreement as originally written, payout was achieved when each participant recovered 150% of their initial investment out of the proceeds of the net production of a given JIB (e.g., an oil or gas well). Once payout was achieved, each participant's proportional ownership interest would be reduced by one-half, and Sierra would acquire a 50% interest in that particular JIB.

¶5      Siemer, through Four Beat, put up the capital required for Sierra to locate and develop oil and gas prospects. According to Siemer, Four Beat put up $1 million dollars as an initial capital contribution. One of the prospects in which Siemer was very

3

interested during this time concerned development rights in properties held by Fulton Fuel. At the time, the properties were burdened by a mortgage and security arrangement in favor of Triassic Energy Partners, LP, of Houston, Texas (Triassic). The Fulton properties could not be developed until the Triassic mortgage and security arrangement were released. On August 6, 2001, Siemer and McDermott discussed Siemer's interest in developing the Fulton Fuel properties. On August 7, 2001, Siemer told McDermott that he was interested in entering into an option agreement with Fulton Fuel for the right to develop wells on its land.

¶6      After further discussions, on August 17, 2001, Fulton Fuel sent Sierra a letter (Letter). The Letter's subject line stated that it was a "Development Option/Letter of Intent." McDermott faxed the Letter to Siemer's Montana counsel. The Letter contained a physical description of the property interests held by Fulton Fuel in Toole, Liberty, Pondera, and Teton Counties. The Letter noted that Sierra had "offered to further develop said properties under an arrangement whereby you would bear the costs of such development and participate on an equal basis with Fulton Fuel Company after recovery of the development costs." The Letter went on to note, however, that the properties were burdened by the Triassic mortgage and security arrangement, and that the properties could not be development until such time as Fulton Fuel's indebtedness to Triassic could be released. The Letter concluded as follows:

> Accordingly, at such time as Triassic Energy Partners, LP releases Fulton Fuel Company from its mortgage obligation and security arrangements, you shall have an option to enter into a development agreement with Fulton Fuel Company to develop those properties.

4

The development agreement will provide that you will furnish all of the capital for such further development and that Fulton Fuel Company will participate with you on an equal basis at such time as you have recovered your costs of development on a well by well payout basis. The development agreement will be aimed at development of incremental production of oil and gas on the lands and leases that will not interfere with FFCo.'s present production. The agreement will terminate three years from the date that Triassic Energy Partners, LP releases its Mortgage and security arrangement with Fulton Fuel Company. FFCo. will operate any and all properties so developed and the parties will enter into a mutually agreeable operating agreement for this purpose.

This letter is of necessity very general, and you understand that we will enter into appropriate contractual arrangements for the development as and when necessary. However, this letter is written to give you assurance that you will have the first and prior option and right to develop the properties as and when they become available.

¶7 As a result of the Letter, Siemer believed that Sierra had acquired an option to develop the Fulton Fuel properties once the Triassic obligations had been released. Since Siemer, through Four Beat, provided Sierra with capital, Siemer believed that he essentially owned Sierra, and thus had acquired the right to develop the Fulton Fuel properties based upon the Letter. Also at that time, Siemer claims that he renegotiated the payout provision in the Agreement in consideration of this option, in order to have the right to develop interests on the Fulton Fuel properties. Instead of requiring each participant to recoup 150% of its initial investment before Sierra itself would acquire a 50% interest, the renegotiated provision required each participant to recoup only 100% of its investment before Sierra itself would acquire an interest.

¶8 On or about November 27, 2002, approximately 3 days before the end of the acquisition period, Siemer and an associate named Ken Alcini (Alcini) entered into a memorandum of understanding with Fulton Fuel. The memorandum allegedly listed the

5

properties which Siemer and Alcini were attempting to sell, and stipulated that Siemer and Alcini would sell the Fulton Fuel properties for a 10% commission. The memorandum had a term of one year, which was renewed in a subsequent agreement between these same parties. Siemer and Alcini worked on selling the Fulton Fuel properties from 2002 to early 2004. One of the entities Siemer attempted to recruit for the purchase was a Canadian company named Wave. According to the record, negotiations with Wave began sometime in the fall 2003. As Siemer directly testified at trial, he believed he was entitled to sell the Fulton Fuel development rights to Wave by virtue of the option agreement embodied in the Letter.

¶9 Summerfield C. Baldridge (Baldridge) was a "land man" who worked for Fulton Fuel from July 1998 until the fall 2003. Baldridge met Siemer in August of 2001 when Siemer was acquainting himself with the Fulton Fuel properties in his capacity as a potential investor. Baldridge subsequently worked for both Sierra and later directly for Four Beat, assisting Siemer with various development projects. At the time of trial, Baldridge was an employee of Four Beat. Baldridge had previously been involved in the attempted sale of the Fulton Fuel properties beginning in February or March 2003. Baldridge assisted Siemer in contacting companies, including Wave, to see if they would be interested in buying the Fulton Fuel development rights. Baldridge was knowledgeable of the on-going discussions concerning the potential purchase of the Fulton Fuel properties by Wave.

¶10 Sometime in late summer or early fall 2004, Wave decided it was not going to purchase the Fulton Fuel properties. After the sale with Wave fell through, Siemer,

McDermott, Bill Fulton, and Baldridge discussed further prospects for selling the Fulton Fuel development rights. According to the testimony of Baldridge, McDermott and Bill Fulton stated that they were tired of the sales process and would like to put the deal indefinitely on hold. At a meeting in November 2004, Baldridge presented some ideas on how the sale could go forward to two attorneys who represented MCR, but McDermott did not personally attend the meeting and none of these ideas were acted upon.

¶11 In February 2005, Baldridge inadvertently discovered that the Fulton Fuel development rights had been sold. Baldridge had been working on a totally unrelated project when he received a call from McDermott asking him to contact a banker named Byron Kluth (Kluth) to discuss changing the collateral on a loan issued to Siemer. When Baldridge contacted Kluth to discuss the issue, Kluth mentioned to Baldridge that Fulton Fuel had sold its properties. This surprised Baldridge.

¶12 Baldridge contacted McDermott to ask him about the sale of the Fulton Fuel properties. McDermott would not identify the buyer and asked Baldridge to keep his knowledge of the sale "under the hat" for a couple of weeks. McDermott also told Baldridge that he knew Siemer would want a commission on the sale, but that he would not be entitled to it because it "wasn't anybody that Siemer knows, they were here long before Siemer or I were on the stage." The next day, Baldridge mentioned the sale to Siemer and Alcini. Baldridge researched the sale in the clerk and recorder's office and discovered that MCR, McDermott's company, had sold the development rights to Wave and another company named Regent.

7

¶13 On October 3, 2005, Four Beat and Siemer filed a complaint against Sierra, MCR, McDermott (in his capacity as the trustee of the Stephco Trust), and Fulton Fuel. They sought damages sustained as a result of breach of fiduciary duties, contractual duties, tort duties and other duties owed them by the defendants. The complaint sought additional forms of relief as well which are not relevant to the appeal presently before the Court. In pertinent part, Four Beat claimed that Sierra had acquired the right to develop the Fulton Fuel properties based on the assurances of Bill Fulton, and the Letter sent by Fulton Fuel to Sierra. Four Beat claimed that Siemer placed his full trust and confidence in Fulton and McDermott to give Sierra the right to develop those properties. Seimer claimed that Four Beat's contributions of capital, and participation under the terms of the Agreement were done with the understanding that the Fulton Fuel development rights would eventually be acquired by Sierra. Four Beat and Siemer alleged that McDermott's later purchase of those rights solely through MCR constituted a breach of the Agreement and a breach of fiduciary duty. In response, MCR and McDermott denied the allegations and denied that it breached any contractual or fiduciary duties owed to the plaintiffs.

¶14 Siemer and Alcini also filed an entirely separate suit against Fulton Fuel for a claimed commission of $2.5 million dollars. The district court in that case ultimately granted summary judgment to Fulton Fuel, and Siemer and Alcini later voluntarily dismissed their appeal.

¶15 Trial in the instant case was convened on June 16, 2008. On the opening day of trial, the District Court, over the objections of Sierra and MCR, ordered that McDermott must stand trial in his individual capacity. The defendants asserted that McDermott was

8

not subject to personal jurisdiction in an individual capacity because he was not named in the complaint as such, nor was he served in his individual capacity with a complaint or summons. The trial continued for one day, until the District Court granted Siemer a mistrial due to the untimely production of an expert witness report.

¶16 A second jury trial was begun on August 25, 2008. The jury heard testimony from Siemer, McDermott, Baldridge, and many other witnesses. In addition to testimony on the factual issues surrounding the formation of the Agreement, the Letter, and the sale of the Fulton Fuel development rights, the jury also heard testimony concerning McDermott's conduct—both in his capacity as an "operator" for Sierra and in his capacity as a participant with MCR—vis-à-vis the Agreement. In particular, Siemer and Four Beat presented expert testimony from a forensic accountant, Joann Barringer (Barringer). Based on an extensive analysis of the financial records of Sierra, Barringer concluded that McDermott's actions caused $317,103.32 in damages to Four Beat. This evidence was entirely unrelated to the claims based on the later sale of the Fulton Fuel properties.

¶17 The jury returned a special verdict on August 29, 2008. The jury's verdict contained several factual determinations which are relevant to this appeal. First, the jury found that MCR breached the Agreement and awarded damages to Four Beat in the amount of $317,103.32. Second, it found that Sierra also breached the Agreement and awarded damages to Four Beat in the amount of $2.5 million dollars. Third, the jury found that the Letter was not a contract. Fourth, the jury found that McDermott had breached his fiduciary duties to Four Beat, and awarded Four Beat $1,000 in damages.

9

Additionally, the jury found that Four Beat had also breached the Agreement, and awarded Sierra $175,384.28 for Four Beat's breach.

¶18    Sierra now appeals from the $2.5 million dollar award of damages to Four Beat for its alleged breach of the Agreement. Sierra asserts the jury's award is not supported by substantial evidence. Sierra also argues that the District Court lacked personal jurisdiction over McDermott in an individual capacity, and that on this ground as well the judgment against it must be reversed. Four Beat urges us to affirm, and argues that the jury's award was supported by substantial evidence, and that jurisdiction over McDermott was proper.

¶19    We state the issues on appeal as follows:

¶20    **Issue One:** *Did the District Court err in concluding it had personal jurisdiction over McDermott in an individual capacity?*

¶21    **Issue Two:** *Was the jury's award of $ 2.5 million dollars to Four Beat supported by substantial credible evidence?*

### STANDARD OF REVIEW

¶22    A court's determination on the question of jurisdiction is a conclusion of law which we review de novo to determine whether the court's interpretation of the law is correct. *Bunch v. Lancair Intl., Inc.*, 2009 MT 29, ¶ 15, 349 Mont. 144, 202 P.3d 784.

¶23    We review a jury's verdict in a civil case to determine if it is supported by substantial credible evidence. *Jenks v. Bertelsen*, 2004 MT 50, ¶ 30, 320 Mont. 139, 86 P.3d 24. "Substantial credible evidence is such evidence which a reasonable mind could accept as adequate to support a conclusion. Evidence is considered substantial even if it is

contradicted by other evidence, somewhat less than a preponderance, or inherently weak." *Tinker v. Mont. State Fund*, 2009 MT 218, ¶ 36, 351 Mont. 305, 211 P.3d 194 (quotation omitted).

## DISCUSSION

¶24 **Issue One:** *Did the District Court err in concluding it had personal jurisdiction over McDermott in an individual capacity?*

¶25 Sierra argues that the District Court committed a plain error of law when it ruled that McDermott was personally subject to suit at the beginning of the first trial because he was not individually named in the complaint and never individually served with process. Sierra asserts that McDermott's presence in the suit in his individual capacity caused it prejudice at trial, and that a new trial must be ordered since McDermott was improperly joined in the suit.

¶26 In response, Four Beat argues that Sierra does not have standing to complain about the District Court's ruling that McDermott was not subject to suit in an individual capacity because McDermott has settled his portion of the case and has not appealed. Furthermore, Four Beat notes that McDermott himself failed to make a motion for severance, and then later subjected himself to personal jurisdiction by appearing before the District Court, without arguing his appearance was limited, and seeking affirmative relief from the District Court.

¶27 As we stated in *Wamsley v. Nodak Mut. Ins. Co.*, 2008 MT 56, 341 Mont. 467, 178 P.3d 102, when a party appears in court and seeks affirmative relief on non-jurisdictional grounds, the defense of lack of personal jurisdiction is waived. *Wamsley*, ¶ 27. Even if

the District Court lacked personal jurisdiction over McDermott in his individual capacity on the opening day of the first trial, McDermott failed to enter a limited appearance and contest the jurisdiction of the District Court. Furthermore, he subsequently sought affirmative relief by participating in court proceedings. On this ground alone, McDermott waived any challenge to the District Court's personal jurisdiction over him. Thus, irrespective of whether Sierra has standing to challenge the District Court's personal jurisdiction over McDermott in an individual capacity, such argument an of necessity would fail. Thus, we deny Sierra's challenge to the District Court's personal jurisdiction over McDermott.

¶28 **Issue Two:** *Was the jury's award of $2.5 million dollars to Four Beat supported by substantial credible evidence?*

¶29 Sierra argues the jury's award of $2.5 million dollars to Four Beat for breach of the Agreement is not supported by substantial evidence. Sierra asserts that the only evidence of damages for its breach of the Agreement was presented through the testimony of Barringer, who fixed damages at $317,103.32. Sierra argues that Four Beat did not place any evidence before the jury which would support a damage award beyond this amount based solely on a breach of the Agreement. Sierra further contends the jury effectively disposed of any damages claims arising from McDermott's sale of the Fulton Fuel development rights when it determined as a factual matter that the Letter was not a contract.

¶30 Sierra asserts that Four Beat's damages claims stemming from the sale of the Fulton Fuel development rights were premised on the notion that Sierra acquired an

interest in those rights by virtue of the Letter. Once the jury determined the Letter was not a contract, an award for damages due to the sale of those development rights simply had no evidentiary support. In fact, Sierra asserts that it never held any development rights in the Fulton Fuel properties because those rights were not acquired during the acquisition period, or at any other time, and that it did not have any obligation to develop them for Four Beat. As a result, Sierra argues that the $2.5 million dollar award was not supported by the evidence or the law concerning damages for breach of contract.

¶31 Further, Sierra argues that the jury was confused when it awarded Four Beat $2.5 million dollars, and that it based its award on Siemer's claim for a 10% commission on the $25 million dollar sale of the Fulton Fuel development rights. Sierra notes that Siemer initiated a separate suit for his 10% sales commission, and later voluntarily dismissed that suit on appeal. Sierra argues the jury's award was simply a subterfuge to award Siemer the very commission which he claimed was denied him in his previous suit.

¶32 Four Beat argues the jury's verdict was supported by substantial evidence and should not be reversed. Four Beat argues that McDermott knew Siemer wanted an option for Sierra to buy the Fulton Fuel development rights, and that McDermott prepared the Letter for Siemer, and subsequently faxed it to Siemer's attorney, in order to memorialize this intention. Furthermore, Four Beat alleges that McDermott knew these development interests were a valuable right, and directly testified that they were worth $2.5 million dollars to McDermott at the time of purchase. Four Beat argues it proved that the development rights were worth even more at the time of trial. Four Beat claims the

evidence showed that Sierra allowed those rights to be placed under McDermott's sole control instead of Sierra's, thus breaching the Agreement. Four Beat argues this evidence supports an award for damages due to Sierra's breach of contract.

¶33 The record in this case supports Sierra's argument. In Four Beat's opening statement, for instance, it tied both the breach of contract and breach of fiduciary duty claims directly to the rights created by the Letter, which it referred to as an "option agreement."

> With respect to the option agreement, we're going to have an expert, a very, very, very well known respected expert who's going to come in and say that the conservative value, the most conservative value you can put on those development rights today, is about 52 million dollars. We're not asking for 52 million bucks. We're asking for half of that, we're asking for 26 million dollars, because you'll see under the option agreement, if he would have gotten the option, as they had promised, he had agreed to split it 50-50, the development of that property, the proceeds, 50-50 with Fulton Fuel Company, so we're not asking for 52, we're asking for 26.
>
> And then, we're going to ask for the same amount of money for the breach of the fiduciary duties because under the—under the exploration agreement, you'll see there's a provision that says, Before you sell any interest in the—in any property that Sierra is involved with, you have to consult with and get the approval of the participants. That option, that option was an option that Sierra was holding in trust for D.R. Four Beat. And it was an absolute breach of Mr. McDermott's fiduciary duty for him not to have told Mr. Siemer about his proposed purchase, because you know what Mr. Siemer would have done, he would have said, Wait a minute, time out, maybe your purchase is fine, but now we've got to talk about how much money Sierra's going to get for these development rights, if any? How am I going to be involved in the development of these properties and so forth? Instead he bought it out from Mr. Siemer and now stands to make many, many, many millions of dollars.

¶34 Furthermore, during Siemer's cross-examination by Sierra, the following exchange occurred concerning Siemer's unsuccessful efforts to sell the Fulton Fuel development rights.

> Q. Okay, [and] one of the entities you attempted to sell the properties to was Wave; correct?
> A. Yes.
> **Q. And you were attempting to sell to Wave the same Fulton Fuel Company properties, in which you now claim to have a development interest, by virtue of the August 17th Agreement; correct?**
> **A. Yes.**

(Emphasis added.)

¶35 Later in trial, when Siemer was cross-examined by Fulton Fuel, the following exchange occurred as well:

> Q. Mr. Siemer, you [and] I are acquainted, I'm Doug Allen, counsel for Fulton Fuel Company, and Sierra Production Company, in this case. Is the agreement under which you are claiming development rights, you say you have an option to development rights; is that based on the letter of August 17th, 2001, which is up there as Defendants' Exhibit O?
> A. Yes.

¶36 After Siemer's testimony, Sierra moved for judgment as a matter of law outside the presence of the jury on the issue of whether the Letter was a contract. Sierra argued that Four Beat had failed to present sufficient evidence to show that the Letter was a contract. In response, Four Beat argued in pertinent part as follows:

> The next issue, is it a contract? Well, that is now up to the jury. We have something in writing, signed by the party to be charged, with testimony that there was consideration. And if it weren't a contract, if it were worthless, then why don't the Defendants all stand up and hand it to us and say, This is all yours, you can have it, it's worthless, here it is. **They are fighting like mad to keep the benefits of that August 17th agreement. Now it's only an issue if it's a contract with respect to**

15

**Fulton Fuel.** . . . The jury can decide whether or not D.R. Four Beat Alliance did have a contract with Fulton Fuel, under that agreement or not.

Now going to the claim against Sierra and others for that agreement, all we're claiming is that MCR and Sierra and McDermott—I mean MCR and McDermott, breached fiduciary responsibilities owed under the respective obligations, the exploration agreement and the accounting relationship that robbed Mr. Siemer of the knowledge, benefit, of getting into the deal when it was clear that Triassic had filed the no interest letters, which are in evidence, and released the development rights, and that land is now being developed. And they have admitted that there is a 26 million dollar damage, for purposes of this motion, we're only arguing liability at this juncture. **So we have a letter, it's in writing, and the letter couldn't be clearer, and they're words of Fulton Fuel, this is to give you assurances, this is to promise, this is an option. You combine that with the strong evidence of the circumstances of what my client wanted and what ultimately happened. There was a contract with Fulton Fuel, it was breached when they decided not to let him know what was going on, it was breached when they sold it to McDermott, it was breached when it got to Wave, that's our case.**

(Emphasis added.)

¶37 Finally, near the end of closing argument, counsel for Four Beat stated the following concerning its claims for damages based on the Letter to the jury:

Twenty-six million dollars for that Option Agreement is just a lot of money. And we are asking you to hold Fulton Fuel Company responsible, not Gary McDermott, not on the Option Agreement. Remember the Option Agreement was Fulton Fuel's Company's responsibility. They're the ones who granted it. They're the ones who sold it to MCR, LLC. . . . **On the breach of fiduciary duty, if you think that somehow this isn't an Option Agreement, that somehow, when the letter says, This is a right and we assure you you'll be given this right when the bank makes it available. And they weren't worried about determining if they could enter into development agreements and things like that, that didn't bother them. If you think that's not a contract, then it's all on Gary McDermott because he breached his fiduciary duty. He took that interest when he knew Mr. Siemer wanted it, and there's $26,000,000.00 there, but he's sitting on hundreds of millions of dollars.**

(Emphasis added.)

16

¶38 The jury concluded that the Letter was not a contract. However, the jury awarded Four Beat $2.5 million dollars for Sierra's breach of the Agreement. The jury further concluded that McDermott personally breached his fiduciary duty to Four Beat, and awarded the sum of $1000 in damages for that breach. These aspects of the special verdict are internally inconsistent, and cannot be reconciled with the manner in which Four Beat pitched the case to the jury. *See* Opinion, ¶ 37. It is not consistent for the jury to find the Letter was not a contract and also conclude that Four Beat was entitled to recover $2.5 million in damages from Sierra, since Four Beat's claim against Sierra in this regard was premised solely upon the assertion that the Letter constituted a contract or valuable right which Sierra held for the benefit of Four Beat.

¶39 Four Beat affirmatively argues that the $2.5 million dollar figure was not concocted by the jury out of thin air, and did in fact have a clear evidentiary basis in the record. This damages figure was based on specific testimony from McDermott where he stated that the development rights to the Fulton Fuel properties were worth $2.5 million dollars at the time he obtained them. This evidence, combined with testimony concerning McDermott's conduct in this matter and his responsibilities to Four Beat under the Agreement, was arguably sufficient to support a jury conclusion that McDermott wrongly appropriated the Fulton Fuel development rights to the detriment of Four Beat. However, such a damage award would logically fall under a breach of fiduciary duty against McDermott—for which the jury awarded Four Beat $1,000—and not a breach of contract claim against Sierra.

17

¶40 While there was arguably sufficient evidence for the jury to conclude that Four Beat suffered $2.5 million dollars in damages from the sale of the Fulton Fuel development rights, Four Beat would appear to be entitled to those damages against Sierra only if the jury concluded that the Letter created some rights or interests in the Fulton Fuel development rights. However, it concluded to the contrary. The simple fact is that, absent a contract, Sierra did not hold any right to develop the Fulton Fuel properties and never acquired any such right or interest during the acquisition period, or at any other time. *See Lee v. Shaw,* 251 Mont. 118, 121, 822 P.2d 1061, 1063 (1991) (discussing the rights created by an option contract).[1] There being no contractual obligation as to the Fulton Fuel properties, the only other contractual obligation that might have imposed upon Sierra the duty to convey the Fulton Fuel development rights to Four Beat was the Agreement itself; however, it is undisputed that the acquisition period under the Agreement had expired on December 1, 2002. In sum, because there was no extant contractual obligation running from Sierra to Four Beat with respect to the Fulton Fuel properties, there is no legal basis for the award of $2.5 million.

¶41 In rare instances, this Court has reversed a jury's verdict and ordered a new trial where the verdict is inconsistent and does not reconcile with the evidence and argument

---

[1] *Lee* also discusses the rights and obligations created by the granting of a "right of first refusal." A right of first refusal creates a preemptive right in property but " 'does not give to the preemptioner the power to compel an unwilling owner to sell; it merely requires the owner, *when and if he decides to sell,* to offer the property first to the person entitled to the preemption, at the stipulated price.' " *Lee*, 251 Mont. at 121, 822 P.2d at 1063 (quoting *Tribble v. Reely*, 171 Mont. 201, 206, 557 P.2d 813, 816 (1976)). (Emphasis in original.) The jury was never asked to decide whether the Letter created a preemptive right on behalf of Sierra with respect to the Fulton Fuel development rights, and whether that right was somehow breached by either Fulton Fuel or Sierra.

presented at trial. In *Rudeck v. Wright*, 218 Mont. 41, 709 P.2d 621 (1985), Lyndon Rudeck died following complications from a surgery. Mr. Rudeck's surviving spouse, Elizabeth Rudeck, filed a complaint against the surgeon. The complaint contained two medical malpractice claims, one in Mrs. Rudeck's own right for alleged wrongful death, and a second one as a survival claim in her personal capacity as the representative of Mr. Rudeck's estate. The jury ultimately returned a verdict of $75,000 for the wrongful death claim, and nothing for the estate's survival claim. Mrs. Rudeck moved for a new trial which was granted by the district court. *Rudeck*, 218 Mont. at 46, 709 P.2d at 624. The surgeon appealed the district court's decision to grant a new trial. In affirming, the Court held that "the jury's verdict in awarding damages on the wrongful death claim and in awarding no damages on the survival claim is totally inconsistent and is contrary to the mandates of law." *Rudeck*, 218 Mont. at 46, 709 P.2d at 624; *see also Abernathy v. Eline Oil Field Servs., Inc.*, 200 Mont. 205, 217, 650 P.2d 772, 779 (1982) (holding that when two conflicting verdicts are reached from the same evidence, a new trial is required); *Mont. Bank of Red Lodge, N.A., v. Lightfield*, 237 Mont. 41, 49, 771 P.2d 571, 576-77 (1989) (affirming a district court's decision to grant a new trial where the jury findings were inconsistent and it was too difficult to speculate as to how the jury arrived at its conclusions).

¶42 Sierra argues on appeal that the jury was "confused" when it awarded Four Beat $2.5 million in damages, because the finding that the Letter did not constitute a contract should have been dispositive of any damages claims against Sierra based on the Fulton Fuel properties. This argument is well taken, but belatedly made. Had Sierra filed a

point brief on this issue and alerted the District Court to this position, much of the confusion could have been avoided. Further, had Sierra proposed a jury instruction or submitted a proposed verdict form explaining to the jury that a finding that the Letter did not constitute a contract would preclude an award of damages against Sierra based on the Fulton Fuel development rights claim, the parties and the Court would not be in the position in which they now find themselves. Instead, the jury in its confusion rendered a verdict which finds support in the record, but is nonetheless internally inconsistent with the evidence and Four Beat's theory of relief.

¶43 Furthermore, unlike *Lightfield* and *Rudeck*, Sierra failed to challenge the inconsistency of the jury's verdict in post-trial proceedings. During trial, it moved for judgment as a matter of law on the question of whether the Letter was a contract. The District Court denied the motion, and allowed the question to go to the jury. Once the jury concluded that the Letter was not a contract and nonetheless awarded $2.5 million dollars based on Sierra's breach of the Agreement, Sierra should have moved the District Court under Rule 59 of the Montana Rules of Civil Procedure for judgment as a matter of law on the issue of the $2.5 million damage award. *See Giambra v. Kelsey*, 2007 MT 158, ¶ 2 n. 1, 338 Mont. 19, 162 P.3d 134; *Campbell v. Canty*, 1998 MT 278, 291 Mont. 398, 969 P.2d 268. Had Sierra filed such a motion in this case, it would have given the District Court the opportunity to consider the arguments now raised by Sierra on appeal, and given the lower court the first opportunity to address and rule on any errors related to the special verdict form, jury instructions, or pleadings. It is a well-established principle of Montana law that claimed errors must generally be raised in the district court before

20

this Court will consider them on appeal, because it is fundamentally unfair to fault the district court for failing to rule on an issue it did not have the opportunity to consider. *State v. Dasen*, 2007 MT 87, ¶ 55, 337 Mont. 74, 155 P.3d 1282.

¶44 Nonetheless, § 25-11-102(6), MCA, does invest this Court with the ability to review Sierra's challenge to the jury's verdict, notwithstanding Sierra's failure to request a new trial or move to alter or amend the judgment before the District Court. This statute reads in pertinent part as follows:

> **25-11-102. Grounds for new trial.** The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:
>
> . . .
>
> (6) insufficiency of the evidence to justify the verdict or other decision or that it is against law . . . .

There was sufficient evidence presented for the jury to award Four Beat damages for the sale of the Fulton Fuel development rights under the following rationales: (1) against McDermott for breach of fiduciary duty; or (2) against Sierra for a breach of the Agreement, if the jury found the Letter was a contract and conferred a right or interest in the Fulton Fuel properties. However, it was logically impossible for the jury to find that the Letter was not a contract, and yet award damages against Sierra based on the later sale of the Fulton Fuel development rights by McDermott. Indeed, Four Beat never argued to the jury that it was entitled to relief under this theory, nor did it present any evidence to support such a claim.

21

¶45    It is apparent that as a result of the manner in which this case was presented, the jury was confused about the remedies available to it.  Thus, it would appear that the evidence, as presented, was insufficient to justify the special verdict form, and that the verdict rendered by the jury was fundamentally inconsistent with the evidence, argument, and legal theories presented at trial.  As Chief Justice Taylor of the Idaho Supreme Court noted in *Christensen v. Stuchlik*, 427 P.2d 278 (Idaho 1967):

> This court has always maintained its authority to review the sufficiency of the evidence to sustain a verdict, when properly assigned, regardless of whether that issue was presented to the trial court specifically by one of the motions mentioned.  Our long-established rule that we will not upset a verdict which is supported by substantial and competent evidence, from which reasonable minds might draw conflicting conclusions, is a complete and adequate safeguard of the integrity of the jury verdict, and of a litigant's constitutional right thereto.  A verdict not so supported is an unjust verdict.  No litigant has a right, constitutional or otherwise, to such a verdict.  A fair jury is a prime requisite of due process.

*Christensen*, 427 P.2d at 283 (Taylor, C.J., concurring and dissenting).

¶46    We conclude that we cannot allow the inconsistent verdict in this case to stand.  When a jury's verdict is logically impossible and simply cannot be reconciled with the evidence, argument and legal theories presented at trial, the constitutional rights of the litigants to a fair trial requires that a new trial be ordered.  However, this holding will apply only in rare circumstances, such as those presented by *Rudeck*, *Abernathy*, *Lightfield*, and the case at bar.  Given our long-standing policy that such issues be first presented at the trial court level, we take this opportunity to strongly recommend that parties wishing to challenge a verdict for the sufficiency of the evidence on appeal first bring such challenges to the district court via post-trial motions.  Indeed, some

jurisdictions require this as a pre-requisite to appeal. *See Napier v. Jacobs*, 414 N.W.2d 862, 864-65 (Mich. 1987); *Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991); *Great Atlantic and Pacific Tea Co., Inc. v. Sealy*, 374 So.2d 877, 880-81 (Ala. 1979); *McAdams, Inc. v. Doggett Leasing Co., Inc.*, 681 S.W.2d 406, 407 (Ark. App. Div. 1 1984). As the Wyoming Supreme Court noted in *Stauffer Chemical Co. v. Curry*, 778 P.2d 1083, 1103-04 (Wyo. 1989), such post-trial motions "while not essential to the exercise of appellate jurisdiction by this court, serve[] as an appropriate first step for contesting an unfavorable verdict and denial of the motion for the directed verdict. In most instances, it would be best to afford the trial court that opportunity to reevaluate its rulings."

## CONCLUSION

¶47 Because the jury's special verdict was not supported by the evidence, argument, and legal theories presented by Four Beat at trial, we reverse the jury's verdict and remand this matter to the District Court for a new trial.

/S/ PATRICIA O. COTTER

We concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ JAMES C. NELSON