FILED

04/25/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0137

DA 16-0137

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 93

IN THE MATTER OF THE ESTATE OF
HELEN EDWARDS,

     Deceased.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Madison, Cause No. DP 29-2013-21
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Ward E. "Mick" Taleff, Connor J. Murphy, Taleff & Murphy, P.C., Great
        Falls, Montana

        Timothy B. Strauch, Strauch Law Firm, PLLC, Missoula, Montana

    For Appellees:

        Stephanie Gehres Kruer, Kruer Law Firm, P.C., Sheridan, Montana
        (*Attorney for Nancy Shulz*)

        Lyman H. Bennett, III, Attorney at Law, Virginia City, Montana
        (*Attorney for Paul Degel*)

    For Amicus Curiae:

        John B. Horrell, Horrell Law Office, PLLC, Missoula, Montana
        (*Attorney for Interim Personal Representative & Special Fiduciary*)

            Submitted on Briefs:  February 15, 2017

                   Decided:  April 25, 2017

Filed:

                        Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 In September 2010, Helen Edwards executed a will and created a trust (2010 Will and 2010 Trust), leaving most of her estate to her niece, G.G. Verone. She executed a new will and amended her trust in 2012 (2012 Will and 2012 Trust), leaving much of her estate to her housekeeper, Nancy Schulz, and to her handyman, Paul Degel. Helen died in 2013. Schulz petitioned for probate of the 2012 Will. Verone objected and cross-petitioned for probate of the 2010 Will and for validation of the 2010 Trust. The District Court appointed Andrew Suenram, an attorney, as a neutral personal representative of the estate until it could be decided which of the two wills should be admitted to probate.

¶2 Following trial, a Madison County jury found in a special verdict that Schulz or Degel procured the 2012 Will and 2012 Trust by "undue influence, fraud, or duress." Verone then moved to admit the 2010 Will to probate, to validate the 2010 Trust, and for attorney fees. The court denied her requests, and Verone appeals those denials. Schulz cross-appeals the court's appointment of Suenram as a neutral personal representative, several evidentiary rulings at trial, and the jury's special verdict.

¶3 We address the parties' claims in the following issues:

1. *Whether the District Court erred in appointing a neutral personal representative who was not required to defend the 2012 Will against Verone's challenge;*

2. *Whether the District Court abused its discretion in its evidentiary rulings at trial;*

3. *Whether substantial credible evidence existed to support the jury's findings that the 2012 Will and the 2012 Trust were procured by undue influence, fraud, or duress;*

4. *Whether the District Court erred in refusing to admit the 2010 Will to probate or to enforce the 2010 Trust following the jury's special verdict;*

2

*5. Whether the District Court erred in refusing to award Verone attorney fees and certain costs.*

¶4 We affirm on Issues 1, 2, and 3, and reverse and remand on Issues 4 and 5.

## PROCEDURAL AND FACTUAL BACKGROUND

¶5 Helen died at the age of 96 in May 2013. Prior to her husband Jim's death, Helen and Jim executed wills naming Verone the primary beneficiary. Verone had maintained a close relationship with Helen and Jim for many years.

¶6 Helen executed a new will and created the Helen Edwards Trust in September 2010. The 2010 Will included a pour-over clause distributing the residue of Helen's estate into the Trust. The 2010 Will and 2010 Trust devised most of Helen's estate to Verone. The 2010 Will named Verone personal representative of the estate, and the 2010 Trust named Helen and Verone co-trustees. The 2010 Trust also prescribed a procedure for amending the terms of the trust.

¶7 Verone hired Schulz in 2011 to work as a housekeeper for Helen. Degel occasionally worked as a handyman for Helen. Helen executed a new will and amended her trust in November 2012, leaving much of her estate to Schulz and Degel, and reducing Verone's gift to $25,000. The 2012 Will appointed Schulz and R.D. Corette, an attorney, as co-personal representatives, and the 2012 Trust removed Verone as a co-trustee. The 2012 Trust provided also for a $300,000 gift to the Ruby Valley Hospital.

¶8 After Helen's death, Schulz and Corette petitioned for formal probate of the 2012 Will. The court appointed Corette as special administrator of the estate. Verone filed objections to probate of the 2012 Will, arguing that Schulz and others procured that will

3

by undue influence. Verone simultaneously offered the 2010 Will for probate and asserted that it and the 2010 Trust represented Helen's last, valid dispositional intentions.

¶9 The court appointed Suenram as interim personal representative of the estate and special fiduciary of the trust. It declared that, because the case sought to determine which of the two sets of testamentary documents was valid, Suenram would not advocate for one set over the other. Suenram informed the parties that he intended to remain neutral as to the validity of the competing sets of testamentary documents.

¶10 The case proceeded to trial in November 2015. At trial, the court made multiple evidentiary rulings over Schulz's and Degel's objections. First, it admitted into evidence documentation of a settlement agreement between Verone and Ruby Valley Hospital, in which Verone agreed to grant the Hospital a $300,000 gift even if the jury invalidated the 2012 testamentary documents. Second, it sustained Verone's objections to testimony by Helen's attorneys regarding what she allegedly told them about her estate plans. Third, it barred one of Schulz's witnesses, Dr. Megan Evans, from testifying altogether.

¶11 At the close of trial, the jury returned a special verdict finding that Schulz or Degel had procured the 2012 Will and 2012 Trust by "undue influence, fraud, or duress." The jury found also that the 2012 Trust did not violate the 2010 Trust's requirements for amendment or revocation. The special verdict form did not ask the jury to make any findings on the 2010 Will or the 2010 Trust.

¶12 Verone filed a bill of costs and statement of fees. The court denied her request for attorney fees and partially denied her request for costs. It reasoned that Verone was statutorily barred from recovering attorney fees because the trial addressed only the validity

4

of the 2012 Will, Verone "contested" that will, and only parties who successfully "defended" a will were entitled to fees.

¶13 Verone also petitioned the court to admit the 2010 Will to probate and to declare the 2010 Trust valid, binding, and enforceable. When the court entered judgment, it denied Verone's requests, reasoning that the litigation "decided nothing about the validity" of the 2010 Will or the 2010 Trust.

¶14 Verone appeals the court's denial of her requests regarding the 2010 Will and the 2010 Trust and its denial of her request for attorney fees and costs. Schulz cross-appeals the court's appointment of Suenram as a neutral personal representative, the court's three evidentiary rulings at trial, and the jury's special verdict finding "undue influence, fraud, or duress."

## STANDARDS OF REVIEW

¶15 We review a district court's appointment of a personal representative to determine whether the court correctly interpreted the law. *In re Estate of McMurchie*, 2004 MT 98, ¶ 7, 321 Mont. 21, 89 P.3d 18. A district court's evidentiary rulings, including the admission of expert testimony, are reviewed for abuse of discretion. *Beehler v. E. Radiological Assocs., P.C.*, 2012 MT 260, ¶ 17, 367 Mont. 21, 289 P.3d 131.

¶16 We review a jury's verdict in a civil case to determine if it is supported by substantial credible evidence. *D.R. Four Beat Alliance, LLC v. Sierra Prod. Co.*, 2009 MT 319, ¶ 23, 352 Mont. 435, 218 P.3d 827; *Murray v. Whitcraft*, 2012 MT 298, ¶ 7, 367 Mont. 364, 291 P.3d 587. Substantial credible evidence is evidence that a reasonable mind could accept as adequate to support a conclusion. *D.R. Four Beat Alliance, LLC*, ¶ 23. We view

5

the evidence in a light most favorable to the prevailing party below. *Murray*, ¶ 7. If conflicting evidence exists, the credibility and weight given to the evidence is in the jury's province, *Campbell v. Canty*, 1998 MT 278, ¶ 19, 291 Mont. 398, 969 P.2d 268, and we do not retry the case because the jury chose to believe one party over the other, *Murray*, ¶ 26.

¶17 We review a party's entitlement to judgment as a matter of law de novo. *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 18, 336 Mont. 105, 152 P.3d 727. A district court's determination whether legal authority exists for an award of attorney fees is a conclusion of law, which we review for correctness. *Mlekush v. Farmers Ins. Exch.*, 2015 MT 302, ¶ 8, 381 Mont. 292, 358 P.3d 913. If legal authority exists to award attorney fees, we review a district court's decision to grant or deny fees to a party for an abuse of discretion. *Wohl v. City of Missoula*, 2013 MT 46, ¶ 29, 369 Mont. 108, 300 P.3d 1119.

**DISCUSSION**

¶18 1. *Whether the District Court erred in appointing a neutral personal representative who was not required to defend the 2012 Will against Verone's challenge.*

¶19 The court initially appointed Corette as special administrator of the Estate, but authorized him only to marshal assets and accounts, to open an estate bank account, and to pay estate bills. Given the two competing wills, the court entered an order stating that it was "inclined to appoint a neutral person/party [as personal representative]" rather than someone "who may have an interest in the interpretation or validity of [the] disputed documents." Verone and special administrator Corette filed a joint motion requesting that the court appoint Suenram as interim personal representative. They suggested that, because

6

the proceedings "involve a Will contest to determine which of two Wills should be probated," Suenram should be appointed "until there has been a legal determination of which Will shall be probated." The court then issued an order appointing Suenram as interim personal representative and terminating Corette's appointment as special administrator.

¶20 Suenram petitioned the court for appointment as special fiduciary of Helen's Trust. He filed a notice of issue pertaining to this appointment and served copies on Schulz and Degel. The court granted Suenram's petition and appointed him special fiduciary of the Trust. Suenram then filed a notice and information to heirs and devisees, confirming his appointment as interim personal representative, and served copies on Schulz and Degel.

¶21 Suenram mailed a letter to Schulz and to Degel's attorney in which he stated that he did not intend to "advocate for one testamentary document over another," because to do so would contradict his role as a "neutral and disinterested party." Suenram requested that the parties stipulate that he had "no fiduciary obligation to advocate for any of the testamentary documents prepared for Helen Edwards." He informed the parties that, if they did not agree to the stipulation, he would "petition the Court for a declaratory ruling regarding [his] fiduciary obligation." When neither Schulz nor Degel's attorney signed the stipulation, Suenram petitioned the court to declare that he was not obligated to defend the validity of any particular testamentary documents, including the 2012 documents. Suenram served this petition on Schulz's and Degel's attorneys.

¶22 Schulz and Degel both formally objected to Suenram's petition. Schulz argued that Suenram "should advance and advocate for the [2012] Will and against the current

challenge to the Will." The District Court granted Suenram's petition. The Final Pretrial Order, signed by counsel for all parties, stipulated that, pursuant to court orders, "Mr. Suenram is a neutral third party in this matter. His role is that of a fiduciary to preserve and maintain the assets of the estate and further distribute the assets pursuant to Court Order. Mr. Suenram will not advocate for any interested party."

¶23 Schulz argues on cross-appeal that the District Court erred in failing to appoint a personal representative charged with defending the 2012 Will against legal attack. Schulz claims that neither she nor Degel received notice of, or consented to, Suenram's appointment as a neutral interim personal representative who would not defend the 2012 Will against Verone's objections.

¶24 Montana law provides that a personal representative has a "duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will," and that the personal representative shall use his authority "for the best interests of successors to the estate." Section 72-3-610, MCA.[1] A personal representative should not take actions that "benefit some of the successors at the expense of others." *In re Estate of Evans*, 217 Mont. 89, 96, 704 P.2d 35, 40 (1985). With regard to trusts, the law provides that "[i]f a trust has two or more beneficiaries, the trustee shall act impartially in investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests." Section 72-38-803, MCA.

---

[1] The law defines "successors" as "persons, other than creditors, who are entitled to property of a decedent under the decedent's will." Section 72-1-103(48), MCA.

¶25 At the time of Suenram's appointment, neither the 2010 Will nor the 2012 Will was "probated and effective." Section 72-3-610, MCA. The identities of the "successors to the estate" were undetermined. Section 72-3-610, MCA. Indeed, the very purpose of the litigation was to determine which of the two competing wills should be admitted to probate.

¶26 Verone filed objections to Schulz's and Corette's petition for formal probate of the 2012 Will and simultaneously offered the 2010 Will for probate. In her amended objections to probate of the 2012 Will, Verone requested "adjudication and judgment that the [2010 Trust] is a valid, binding, and enforceable irrevocable Trust" and "adjudication and judgment . . . admitting the [2010 Will] to formal probate." In Schulz's response to Verone's amended objections, Schulz denied Verone's contentions that the 2010 Will and 2010 Trust were "validly executed," that they "met all legal requirements," and that they "represent[ed] the last valid dispositional intentions of Helen Edwards."

¶27 In Verone's and special administrator Corette's joint motion for appointment of a personal representative, the two stated, "These proceeding[s] involve a Will contest to determine which of two Wills should be probated." In the Final Pretrial Order, Verone identified as an issue of law, "Which of Helen Edwards' two wills (2010 or 2012) should be admitted to formal probate?" In that same order, Schulz and Degel denied "all contentions" of Verone and took the position that the 2012 Will was valid and that it revoked the 2010 Will. Schulz and Degel identified as issues of law, "Should Helen Edwards' 2012 Last Will and Testament be admitted to probate? . . . If not, should Helen Edwards' 2010 Last Will and Testament be admitted to probate?"

9

¶28 In an order on motions, the court acknowledged that Verone had "filed objections to probate of the 2012 Will and petitioned for formal probate of the 2010 [W]ill" and that, "[*i*]*n light of these competing petitions*, the parties agreed that the Court should appoint Andrew Suenram . . . 'as interim personal representative.'" (Emphasis added.) In that same order, the court noted that "Verone has challenged the 2012 Will and offered the 2010 Will. The Court must determine the validity of the *competing wills*." (Emphasis added.) Finally, the court acknowledged in its order on costs and fees that "Verone filed objections to the probate of the 2012 Will, alleging that it had been procured by undue influence, fraud, or duress. In the same document, Verone petitioned for formal probate of the 2010 Will."

¶29 As shown by the parties' pleadings and the court's treatment of the case, this litigation represented a contest between two competing wills to determine which should be admitted to probate. The court committed no legal error when it appointed Suenram as a neutral personal representative and held that he had no duty to defend either will until a determination had been made as to which will was valid and effective. *See In re Estate of McMurchie*, ¶ 7.

¶30 Schulz's claim that she and Degel did not receive proper notice that Suenram would be appointed as a neutral personal representative lacks support in the record. Special administrator Corette—who had jointly petitioned with Schulz for probate of the 2012 Will—stipulated to Suenram's appointment as interim Personal Representative after the court stated that it was "inclined to appoint a neutral person/party to serve as the Personal Representative." Schulz and Degel were notified that the court had appointed Suenram as

10

personal representative. Suenram notified Schulz and Degel in writing that he intended to seek a court ruling that he was not obligated to advocate for the 2012 testamentary documents. When Suenram petitioned the court for such a ruling, he served his petition on Schulz and Degel. Schulz and Degel formally objected to that petition. They later stipulated in the Final Pretrial Order to Suenram's appointment as "a neutral third party" who would not "advocate for any interested party." Schulz and Degel thus had notice of Suenram's appointment as a neutral personal representative and special fiduciary. The District Court did not err in its appointment of Suenram.

¶31   2. *Whether the District Court abused its discretion in its evidentiary rulings at trial.*

¶32   Schulz appeals three evidentiary rulings that the District Court made at trial: the court's admission into evidence of a settlement agreement between Verone and Ruby Valley Hospital; the court's refusal to permit Helen's former attorneys from recounting certain statements Helen allegedly made about her estate plans; and the court's decision to bar Schulz's expert witness Dr. Megan Evans from testifying.

**A. Verone's settlement documents with the Hospital.**

¶33   Helen's 2012 Trust included a $300,000 gift to the Ruby Valley Hospital. Her 2010 testamentary documents contained no such bequest. Verone entered into a settlement agreement with the Hospital agreeing to give the Hospital $300,000 if she prevailed in admitting the 2010 Will to probate and in enforcing the 2010 Trust. Verone and the Hospital filed a joint petition for approval of their settlement with the court, and the court approved the agreement.

11

¶34 At trial the court barred the parties from discussing the settlement agreement in the presence of the jury. During the testimony of Bethany Clark, an Adult Protective Services worker who conducted an investigation for financial exploitation of Helen, Schulz's attorney asked the witness, "if you were to learn subsequently that Ms. Verone doesn't have any objection to the gift to the hospital [in the 2012 Trust], does that change the outcome of your investigation?" Verone's attorney objected to the question for assuming facts not in evidence, and the court sustained the objection.

¶35 Verone subsequently sought to admit documentation of her settlement agreement with the Hospital into evidence, and the court allowed her to do so. The court reasoned that "Ms. Verone's attitude about a gift to the hospital has been brought into question by [Schulz's attorney's] inquiry." It stated further, "The inquiry is before the jury, so the Court is inclined to allow Ms. Verone to address it however she wishes."

¶36 Schulz argues that the court erred in admitting evidence of the settlement between Verone and the Hospital. In Schulz's view, Verone sought to introduce this settlement for the purpose of proving that the parties agreed to the settlement, which M. R. Evid. 408 prohibits.

¶37 Montana law provides that evidence pertaining to settlement negotiations is inadmissible to prove liability or the validity of a claim or its amount. M. R. Evid. 408; *Kiely Constr. L.L.C. v. City of Red Lodge*, 2002 MT 241, ¶ 95, 312 Mont. 52, 57 P.3d 836. Under the "opening the door" doctrine, however, "the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence

on the same issue to rebut any false impression that might have resulted from the earlier admission." *Stevenson v. Felco Indus.*, 2009 MT 299, ¶ 40, 352 Mont. 303, 216 P.3d 763.

¶38 The District Court found that when Schulz suggested to Bethany Clark that Verone did not object to the 2012 Trust's $300,000 gift to the Hospital, she broached a subject that the court had barred from discussion—Verone's settlement with the Hospital. Because Schulz raised this topic, the court permitted Verone to "introduce evidence on the same issue" by showing the jury that she entered into an agreement with the Hospital to convey the $300,000 gift no matter the outcome of the litigation. *Stevenson*, ¶ 40. The court did not abuse its discretion in concluding that Schulz opened the door to admission of the settlement documents into evidence. *Beehler*, ¶ 17.

### B. Testimony of Helen's attorneys.

¶39 The District Court prevented Helen's former attorneys from recounting statements that Helen may have made about her dispositional intentions when she executed the 2012 Will and the 2012 Trust. For instance, Schulz asked William Kebe, one of Helen's former attorneys, whether Helen had discussed with him "the changes that she wanted to make to her will and her trust" during a September 2012 meeting. The court sustained Verone's objection. Responding to another question, Kebe testified, "The primary thrust of the conversation was she wanted to change . . . ." The court again sustained Verone's hearsay objection. The court also prevented Kebe from answering questions about whether Helen said that she wanted to cut Verone out of the 2012 Will and the 2012 Trust. The court did permit testimony by Helen's attorneys about their interactions with her, their observations

13

of her, the work they did in preparing her wills and trust documents, and their standard practices in preparing testamentary documents.

¶40 Schulz argues that the District Court wrongly barred Helen's attorneys from commenting on Helen's statements that may have reflected her testamentary intent. In her view, Helen's statements to her attorneys were admissible under M. R. Evid. 804(b)(5) because they contained "circumstantial guarantees of trustworthiness," and under M. R. Evid. 803(3) because they showed Helen's "state of mind." Schulz contends also that these statements were admissible under the "verbal act doctrine," because the testimony sought to prove merely that Helen made the statements, as opposed to proving the truth of the matter asserted within the statements.

¶41 Hearsay statements are inadmissible unless they fall under an exception. M. R. Evid. 802. The "then-existing state of mind" exception of M. R. Evid. 803(3) does not permit the admission of a testator's declarations "as to the existence or revocation of the will and the testator's attitude toward the contestee of the will." *In re Estate of Harmon*, 2011 MT 84A, ¶ 32, 360 Mont. 150, 253 P.3d 821 (internal quotes and citation omitted). The exception of M. R. Evid. 804(b)(5) for hearsay statements that have "comparable circumstantial guarantees of trustworthiness" as other hearsay exceptions applies narrowly in estate disputes. *Harmon*, ¶ 37. "Given the often highly contentious nature of estate distribution . . . Montana law has historically been hostile to the admissibility of out-of-court statements made by the testator regarding his or her testamentary intentions when a valid will exists and the testator's mental capacity is not at issue." *Harmon*, ¶ 37. The "verbal act doctrine," which allows for admission of statements "for the purpose of

14

establishing the fact that the words had been said," applies only "where the issue is the existence of statements, not the truth of the matters asserted within them." *Phillip R. Morrow, Inc. v. FBS Ins. Mont.-Hoiness Labar, Inc.*, 236 Mont. 394, 399, 770 P.2d 859, 862 (1989) (internal quotes and citation omitted).

¶42 Helen's statements to her attorneys about her dispositional intentions—including what she may have said about wanting to reduce Verone's gift—pertain to "the testator's attitude toward the contestee of the will," and as such are not admissible under the state of mind exception of Rule 803(3). *Harmon*, ¶ 32. This case deals with the "highly contentious" distribution of Helen's estate, and Helen's alleged statements are "out-of-court statements made by the testator regarding his or her testamentary intentions." *Harmon*, ¶ 37. As such, Helen's statements to her attorneys do not contain "comparable circumstantial guarantees of trustworthiness." M. R. Evid. 804(b)(5); *see Harmon*, ¶ 37. The verbal act doctrine does not apply here because the issue is not whether Helen discussed her dispositional intentions with her attorneys—"the existence of statements"—but rather what she told them—"the truth of the matters asserted within [the statements]." *Morrow*, 236 Mont. at 399, 770 P.2d at 862; *see also In re Estate of Mead*, 2014 MT 264, ¶¶ 23-24, 376 Mont. 386, 336 P.3d 362 (holding that the verbal act doctrine applied to the testator's out-of-court statement acknowledging his signature on the will because "the existence of" that statement was "material" to determining the validity of the witness's signature"). The District Court therefore did not abuse its discretion in sustaining objections to testimony by Helen's attorneys regarding Helen's statements of her dispositional intentions. *Beehler*, ¶ 17.

### C. Testimony of Dr. Megan Evans.

¶43    Schulz sought to call Dr. Megan Evans, who evaluated Helen for competency in October 2012, as an expert witness at trial. Before trial, the court granted Verone's witness sequestration motion, in which Verone had asked the court to "instruct all parties and witnesses not to divulge to other witnesses any aspect of their trial testimony or evidence presented during trial prior to the witness being excused by the Court."

¶44    A few days before Dr. Evans's scheduled testimony, Dr. Bill Rosen, a medical doctor, testified as an expert witness for Verone. Dr. Rosen opined that Helen was unduly influenced. During his testimony, he referenced a three-page document that he claimed constituted medical literature in support of his testimony. Dr. Rosen gave a copy of this document to Schulz's counsel.

¶45    On the day of Dr. Evans's testimony, Verone's counsel noticed that Dr. Evans was in possession of the three-page document to which Dr. Rosen had referred during his testimony. When Verone's counsel asked where Dr. Evans obtained the document, Dr. Evans answered that Schulz's counsel had provided the document to her and asked her to review it before testifying. Verone's counsel informed the court of this interaction, and Schulz's counsel did not deny that she gave the document to Dr. Evans. The court admonished Schulz's counsel for violating its witness sequestration ruling, and Verone asked the court to bar Dr. Evans from testifying.

¶46    After significant deliberation with Verone's and Schulz's counsel, the court elected to proceed with voir dire of Dr. Evans. Dr. Evans stated in voir dire that she only evaluated Helen for competency, but not for her ability to withstand influence. Dr. Evans did note,

however, that she made "observations" about Helen's mental condition that led her to an opinion about Helen's ability to withstand influence.

¶47 The court decided to bar Dr. Evans from testifying at trial. It noted that Dr. Evans "did not evaluate Helen Edwards for matters of undue influence . . . she made observations. But her observations are of no utility unless she made an evaluation." The court reasoned that it did not wish to "risk confusing the jury by allowing her to testify about her . . . observations." It stated its concern that Dr. Evans's status as a doctor might cause the jury to give undue weight to her mere "observations."

¶48 Schulz argues that the District Court abused its discretion by preventing Dr. Evans from testifying. She contends that Dr. Evans's testimony was relevant to the jury's consideration of Helen's susceptibility to undue influence. Exclusion of this testimony, in Schulz's view, prejudiced Schulz by possibly affecting the outcome of the trial.

¶49 "A district court has broad discretion over the admissibility of evidence and control of pretrial and trial proceedings." *Folsom v. City of Livingston*, 2016 MT 238, ¶ 16, 385 Mont. 20, 381 P.3d 539 (internal quotes and citation omitted). "[T]rial administration issues" likewise fall within the discretion of the district court. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45. A court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." M. R. Evid. 403. "A district court does not abuse its discretion in excluding evidence that it reasonably determines . . . would likely lead to unnecessary confusion." *S & P Brake Supply, Inc. v. STEMCO LP*, 2016 MT 324, ¶ 51, 385 Mont. 488, 385 P.3d 567 (internal quotes and citation omitted) (hereafter *S & P*).

¶50 "Even if a court abuses its discretion in an evidentiary ruling, that abuse does not necessarily constitute reversible error." *S & P*, ¶ 51 (internal quotes and citation omitted). Reversible error occurs only when "a substantial right of the party is affected." *Reese v. Stanton*, 2015 MT 293, ¶ 25, 381 Mont. 241, 358 P.3d 208 (citing M. R. Evid. 103). "[A] substantial right of a party is not affected unless the challenged evidence is of such character to have affected the result of the case." *S & P*, ¶ 51 (internal quotes and citation omitted).

¶51 Numerous professional witnesses and friends of Helen provided testimony that Helen was not susceptible to undue influence. William Kebe, who met with Helen to prepare her 2012 testamentary documents, testified that he observed that Helen was "deliberate" and that she "knew what she was doing [and] why she was doing it." Maria Kegie-Shutey, another attorney present when Helen signed her 2012 testamentary documents, testified that she saw no signs that Helen was unduly influenced or was changing her will and trust by anything other than her own free will. Gayla Allhands, a friend of Helen, testified that Helen was "sharp as a tack," that she always exercised free will, and that she was not susceptible to undue influence. Dr. Roman Hendrickson, Helen's physician from 2006 to 2009 and again in 2012, testified that Helen seemed independent, that she was not susceptible to other people telling her what to do, and that she appeared in charge of her own affairs, such as maintaining her household, keeping her appointments, and entertaining visitors. He testified that he did not observe any signs of undue influence. Ken Fenno, Chief Executive Officer at Helen's bank, testified that, when Helen came into

the bank in 2012, he was impressed by "how sharp she was for her age" and that she did not appear distressed or susceptible to undue influence.

¶52 Schulz presented considerable evidence, including testimony both from friends and from professionals who had worked with Helen, attesting to their observations about Helen's susceptibility, or lack thereof, to undue influence. In the face of this evidence, we cannot conclude that the exclusion of Dr. Evans's testimony affected the outcome of the case. Dr. Evans would have supplied her own observations on the same point, which largely would have been cumulative of the other evidence. The District Court made a discretionary ruling to preclude her testimony based in part on its conclusion that the jury would afford undue weight to Dr. Evans's observations over those of other witnesses. We conclude that its ruling, even if arguably in error, is not cause for reversing the verdict. *Reese*, ¶ 25; *S&P*, ¶ 51.

¶53 3. *Whether substantial credible evidence existed to support the jury's findings that the 2012 Will and the 2012 Trust were procured by undue influence, fraud, or duress.*

¶54 Schulz argues on appeal that Verone presented no evidence that Schulz or Degel committed any acts of undue influence, fraud, or duress and therefore that the jury's special verdict was unsupported by substantial credible evidence. Schulz contends that evidence that she and Degel had the "opportunity" to unduly influence Helen or that there was suspicion of undue influence was insufficient without proof of specific acts by Schulz or Degel with the purpose of affecting changes to Helen's will and trust.

19

¶55　Montana law provides that a finding of either undue influence, fraud, or duress may invalidate a will or a trust.  Section 72-38-406, MCA; *see* § 72-3-310, MCA.  The statute defines undue influence as:

> (1) the use by one in whom a confidence is reposed by another person or who holds a real or apparent authority over the other person of the confidence or authority for the purpose of obtaining an unfair advantage over the other person;

> (2) taking an unfair advantage of another person's weakness of mind; or

> (3) taking a grossly oppressive and unfair advantage of another person's necessities or distress.

Section 28-2-407, MCA.  Will contestants have the burden of establishing undue influence, fraud, or duress in the execution of the will.  Section 72-3-310, MCA.

¶56　"To establish undue influence, a party must present specific acts showing that undue influence actually was exercised upon the mind of the testator directly to procure the execution of the will."  *Mead*, ¶ 27 (citing *Harmon*, ¶¶ 21-22) (internal quotes omitted).  A trier of fact should consider "the opportunity for undue influence, including the testator's susceptibility to influence, and whether the disposition of property was natural."  *Mead*, ¶ 27.  The mere "opportunity to exercise undue influence on the testator is not sufficient to prove undue influence and invalidate a will.  Rather, the opportunity to exercise undue influence is to be considered and correlated with the alleged acts of influence to determine if the acts amount to undue influence."  *In re Estate of Harms*, 2006 MT 320, ¶ 36, 335 Mont. 66, 149 P.3d 557.  Likewise, the existence of a confidential relationship, without evidence of a specific act of undue influence, is insufficient to show "that the relationship was *used* for the purpose of obtaining an unfair advantage."

20

*Harmon*, ¶ 47 (emphasis in original). A finding of undue influence may be based on circumstantial evidence. *See In re Estate of Lightfield*, 2009 MT 244, ¶¶ 40-42, 351 Mont. 426, 213 P.3d 468.

¶57 The testimony at trial established that, prior to Schulz's employment as Helen's housekeeper, Verone maintained a close relationship with Helen throughout Verone's childhood and adult life. Helen and her late husband Jim treated Verone "like their daughter." Helen spoke on the phone with Verone almost daily. Verone was the primary beneficiary in Helen's and Jim's 2007 wills and in Helen's 2010 testamentary documents. Testimony from Verone and Helen's friends alleged that Schulz was not a significant part of Helen's life prior to her employment in 2011. Indeed, some of Helen's longtime friends, such as Van Crosby, testified that they had never heard of Schulz prior to 2011.

¶58 Helen's friends Betty Staley, Doris Ryan, Crosby, and Diane Orr testified that, when they would visit Helen at home or in the hospital, Schulz typically would not leave the room or give them privacy, and when she did, she did so reluctantly. Schulz would answer Helen's phone when these friends called her, and Schulz often would not allow them to speak with Helen. Crosby testified that Schulz was "dominating" Helen. Testimony from Staley, Ryan, Verone, and Vicki Gordon established that Helen engaged in behavior with Schulz that the witnesses viewed as disturbing and uncharacteristic of Helen. This behavior included Schulz and Helen rubbing noses, sticking their tongues out at each other, and speaking "baby talk" to each other.

¶59 Dr. Rosen testified that Helen experienced "social isolation," that she was susceptible to undue influence, and that the estate plan described in her 2012 testamentary

21

documents was consistent with a finding of undue influence. Testimony from Bethany Clark, who relayed notes from Helen's former doctor, Dr. Googe, established that Helen was "highly vulnerable" and "easily manipulated" by persons in close contact with her.

¶60 After Schulz began working as Helen's housekeeper, Orr noticed that Helen became unusually quiet and less "open" than she used to be and that she began to "curl into herself." Orr testified that she previously knew Helen to be "outgoing" and "vivacious." Staley testified that Helen started acting differently in 2012 and appeared "more distressed," "more insecure," and "anxious."

¶61 Gordon testified that Helen seemed "dependent" on Schulz and that Helen did not seem to be "in charge" or making her own decisions. Staley's and Kebe's testimony established that Helen attempted to remove Staley as a beneficiary of her will shortly after Staley got into an argument with Schulz in April 2013. Verone testified that in August 2012 she heard Schulz order Helen to "get those papers; we need to have those papers signed," referring to documents that Schulz wanted Verone to sign. Verone claimed that, around that same time, Schulz began writing herself checks from Helen's bank account for her work as Helen's housekeeper, rather than submitting her timesheets to Verone as she had done before. In October 2012, Schulz accompanied Helen to the bank, where Helen added Schulz as a signatory on her checking account. Around the same time, Helen gave Schulz two powers of attorney.

¶62 Testimony from Verone and Degel established that Degel wanted Helen's property "on the mountain"—property that Helen ultimately gifted to him in her 2012 Trust. Degel testified that he, Schulz, and Helen visited the mountain property in 2012 and generally

22

discussed Helen's estate planning there. On two occasions in 2012, Schulz drove Helen to her attorney's office—approximately a two-hour round-trip drive—where she had appointments to discuss changes to her testamentary documents.

¶63 Schulz and Degel testified that they believed Verone wanted to put Helen in a nursing home. Degel stated that he knew Helen believed Verone wanted to put her in a nursing home, and he admitted that he did nothing to ease Helen's concerns that Verone would do that. Crosby, who knew Degel well, testified that Degel constantly criticized Verone and made derogatory comments about her. Testimony from Verone and Staley established that Helen became more critical of Verone in 2012 than she had ever been. Verone testified that Helen became "cold" and "distant" towards her and did not want to talk to her.

¶64 The evidence before the jury that Schulz or Degel exercised undue influence on Helen was substantial. The testimony established that Schulz and Helen had a confidential relationship and that Schulz held "real or apparent authority over" Helen, including, among other things, Schulz's status as a housekeeper, her screening of Helen's phone calls, her failure to leave the room when Helen's friends came to visit, and the fact that she had obtained Helen's powers of attorney and the right to sign checks from Helen's account. Section 28-2-407(1), MCA. There also was substantial evidence showing that Schulz and Degel had "the opportunity to exercise undue influence" on Helen. *Estate of Harms*, ¶ 36. This included testimony that Schulz isolated Helen socially, testimony that Dr. Rosen believed that Helen was susceptible to undue influence, and testimony that Dr. Googe believed that Helen was "vulnerable" and "easily manipulated." The jury could have

inferred from the evidence that Helen's "disposition of property was [not] natural," given Helen's closeness to Verone for so many years, her inclusion of Verone as the primary beneficiary in her 2007 and 2010 testamentary documents, and the testimony that Helen and Schulz were not close prior to Schulz's employment in 2011. *Mead*, ¶ 27.

¶65 The testimony also provided the jury with substantial circumstantial evidence to conclude that Schulz or Degel had committed "specific acts" in order to "procure the execution of the will." *Mead*, ¶ 27. The testimony established that Schulz's and Degel's increasing involvement in Helen's life leading up to the execution of her 2012 Will and her 2012 Trust coincided with Helen's change in personality and a deterioration of her relationship with Verone. The jury could have inferred from the testimony that Schulz and Degel deliberately acted to convince Helen to replace Verone with them as primary beneficiaries to her estate. The circumstantial evidence supported a finding that Schulz and Degel may have acted to exacerbate Helen's fear that Verone would put her in a nursing home despite evidence that Verone acted to reduce the need to move Helen into a nursing home. Verone hired Schulz to assist Helen with household maintenance, and she remodeled Helen's home to improve its accessibility. The jury also could have inferred from the evidence that Schulz and Degel used their exclusive access to Helen—driving her to appointments with her attorneys and to her mountaintop property to discuss her estate plans—to pressure Helen to change her estate plan in their favor. Thus, by considering "the opportunity to exercise undue influence" together with both direct and circumstantial evidence of the "alleged acts of influence," the jury reasonably could have determined that Schulz's and Degel's actions amounted to undue influence. *In re Estate of Harms*, ¶ 36.

24

¶66 Viewing the evidence in a light most favorable to Verone, we conclude that the jury's findings that the 2012 Will and the 2012 Trust were procured by "undue influence, fraud, or duress" were supported by substantial credible evidence. *Murray*, ¶ 7; *D.R. Four Beat Alliance, LLC*, ¶ 23. Schulz and Degel presented evidence to the contrary, but it was within the province of the jury to determine the weight and credibility to give to the conflicting evidence. *Campbell*, ¶ 19. "[W]e do not retry the case because the jury chose to believe" Verone's evidence over Schulz's and Degel's. *Murray*, ¶ 26.

¶67 Finally, Verone appeals the jury's finding that the 2012 Trust "substantially [complied] with the method provided to alter, amend, or revoke" the 2010 Trust. Because the jury's invalidation of the 2012 Will and the 2012 Trust was supported by substantial credible evidence, whether the 2012 Trust complied with the required procedures for amendment of the 2010 Trust is moot.

¶68 4. *Whether the District Court erred in refusing to admit the 2010 Will to probate or to validate the 2010 Trust following the jury's special verdict.*

¶69 Following the jury's verdict, Verone requested judgment admitting the 2010 Will to probate and recognizing the 2010 Trust as "valid, binding, and enforceable." The District Court entered judgment invalidating the 2012 Will and the 2012 Trust but refused Verone's requests regarding the 2010 Will and the 2010 Trust. The court reasoned that the 2010 testamentary documents were not at issue in this case. It stated that the 2010 Will had not been submitted "to scrutiny by the Court and potential objectors" and that the jury's special verdict "did not confirm the validity of the 2010 Will."

¶70 Schulz and Degel argue that the trial resolved only the issue whether the 2012 testamentary documents were valid and that the 2010 testamentary documents were not at issue in this case. They assert that a separate probate hearing would be required in order to determine the validity of the 2010 Will.

¶71 A party may initiate formal probate of a will by petitioning the court for testacy proceedings. Section 72-3-301, MCA. The petition must request "an order as to the testacy of the decedent in relation to a particular instrument . . . and determining the heirs" and must state "whether the original of the last will of the decedent is in the possession of the court or accompanies the petition." Section 72-3-301(1), MCA. "A formal testacy proceeding may be commenced by an interested person filing a petition . . . as described in 72-3-301(1) in which the person requests that the court, after notice and hearing, enter an order probating a will." Section 72-3-302(2), MCA. Once the court sets a hearing, the petitioner must give notice of the hearing to all interested parties. Section 72-3-305, MCA. "Any party to a formal proceeding who opposes the probate of a will for any reason shall state in the pleadings the party's objections to probate of the will." Section 72-3-308, MCA. "If a will is opposed by the petition for probate of a later will revoking the former, it shall be determined first whether the later will is entitled to probate." Section 72-3-311, MCA. After the court conducts a hearing and other procedural requirements have been met, the court "shall determine . . . the decedent's state of testacy. Any will found to be valid and unrevoked must be formally probated." Section 72-3-313, MCA.

¶72 Our de novo review of Verone's entitlement to judgment as a matter of law leads us to conclude that the District Court erred in refusing to admit the 2010 Will to probate and

to enforce the terms of the 2010 Trust. It is undisputed that Schulz and Corette fulfilled the procedural requirements for initiating formal probate proceedings under §§ 72-3-301, -302, and -305, MCA. Verone objected to probate of the 2012 Will, in compliance with § 72-3-308, MCA, and cross-petitioned for probate of the 2010 Will. When Verone petitioned the court to enter judgment admitting the 2010 Will to probate, she joined the issue of the 2010 Will's validity to the petition for probate of the 2012 Will.

¶73 The litigation before the District Court constituted a contest between the 2010 Will and the 2012 Will. Because Schulz and Degel opposed probate of the 2010 Will through the "petition for probate of a later will revoking the former [will]," the court was required to determine "first whether the later will [was] entitled to probate." Section 72-3-311, MCA. The jury's special verdict answered this question when it invalidated the 2012 Will.

¶74 Once the jury issued its verdict, the court was required to determine "the decedent's state of testacy" and formally probate "[a]ny will found to be valid and unrevoked." Section 72-3-313, MCA. Verone had admitted the 2010 Will into evidence without objection. Schulz and Degel stipulated in the Final Pretrial Order that the 2010 Will was "properly witnessed and notarized" and that Helen "did not lack Testamentary Intent or Capacity" when she executed that will.

¶75 Only an "interested person" possesses legal standing to contest a will. Section 72-3-302(2), MCA; *Stoican v. Wagner (In re Estate of Lawlor)*, 2015 MT 54, ¶ 16, 378 Mont. 281, 343 P.3d 577. A party qualifies as an "interested person" if he or she has "a property right in or claim against . . . the estate of a decedent." Section 72-1-103(25),

MCA. "That is, a party has standing to contest a will if he or she stands to gain from a successful contest." *Stoican*, ¶ 16.

¶76 Aside from their claims under the 2012 Will, Schulz and Degel did not have standing to challenge the 2010 Will. That will did not name them as beneficiaries, and they would not have been entitled to an intestate share of Helen's estate, because they are not related to her. *See generally* §§ 72-2-111 to -124, MCA. They did not "stand[ ] to gain from a successful contest" of the 2010 Will. *Stoican*, ¶ 16. Thus, once the jury declared the 2012 Will invalid, the 2010 Will became the only "valid and unrevoked" will before the court. Section 72-3-313, MCA. Helen's "state of testacy" at that point was that her 2010 Will was the only will that represented her dispositional intentions. Section 72-3-313, MCA. The court was statutorily required to admit the 2010 Will to probate. Section 72-3-313, MCA.

¶77 The Montana Rules of Civil Procedure provide that a judgment "should grant the relief to which each party is entitled." M. R. Civ. P. 54(c); *Goodover v. Lindey's*, 255 Mont. 430, 438, 843 P.2d 765, 770 (1992). Questions of law must be decided by a court, rather than by a jury. Section 26-1-201, MCA.

¶78 Verone asserted the validity of the 2010 Trust, and Schulz and Degel did not object to the 2010 Trust's validity other than by asserting that the 2012 Trust amended it. When the jury issued its verdict invalidating the 2012 Trust, the only valid trust remaining before the court was the 2010 Trust.

¶79 The District Court was obligated in issuing its judgment not only to enforce the mandate of the jury's special verdict, but to "grant the relief to which each party [was]

28

entitled." M. R. Civ. P. 54(c); *Goodover*, 255 Mont. at 438, 843 P.2d at 770. Because the parties pleaded, and the litigation involved, a contest between two sets of competing testamentary documents, and the jury invalidated the 2012 set, Verone was legally entitled to probate of the 2010 Will and validation of the 2010 Trust.

¶80 The validity of the 2010 testamentary documents was not a fact that the parties put at issue for the jury to decide. Admission of the 2010 Will to probate and enforcement of the 2010 Trust—the only valid testamentary documents before the court after the jury issued its verdict—was a question of law to be decided by the court, not by the jury. *See* § 26-1-201, MCA.

¶81 We reverse and remand with instructions that the court admit the 2010 Will to probate and enforce the terms of the 2010 Trust.

¶82 5. *Whether the District Court erred in refusing to award Verone attorney fees and certain costs.*

¶83 After the jury's special verdict, Verone filed a bill of costs and statement of fees in which she requested a total of $903,468.56, which included $892,018.63 in attorney fees and $11,449.93 in costs. The District Court denied Verone's request for attorney fees and partially denied her request for costs. In denying Verone's request for attorney fees, the court reasoned that the relevant statute—§ 72-12-206, MCA—"limits recovery of attorney fees to only those parties who successfully defended a will. It specifically precludes parties who contest a will from recovering attorney fees even if successful." The court found that Verone had contested probate of the 2012 Will, but that Schulz and Degel had not contested probate of the 2010 Will. Further, the court reasoned that the statute permitted recovery of

29

attorney fees by the party defending a will only "if the will in probate is confirmed." Because Verone contested the 2012 Will but did not defend the 2010 Will, and because neither will was admitted to probate, the court concluded that the statute barred Verone from recovering attorney fees.

¶84    Verone argues that the court erred in not awarding her attorney fees.[2]  She asserts that she defended the 2010 Will and therefore that § 72-12-206, MCA, did not bar her from recovering attorney fees.  Verone requests that this Court remand for a determination and award of the appropriate fees to be awarded to her.  She contends also that she is entitled to attorney fees under § 72-3-632, MCA, because the 2010 Will nominated her personal representative.

¶85    Schulz and Degel assert that the District Court was correct in its ruling on attorney fees because Verone contested—rather than defended—the 2012 Will, which in their view was the only will at issue in the case.  They argue that the 2010 Will was not litigated before the District Court, that they did not contest that will, and therefore that the statute bars Verone's request for attorney fees.

¶86    The statute governing awards of attorney fees to parties in a will contest provides:

> When the validity or probate of a will is *contested* through court action, *the attorney fees and costs*, as provided in 25-10-201, *incurred in defending the validity or probate of the will must be paid by the party contesting the validity or probate of the will if the will in probate is confirmed*. If the probate is revoked, costs, as provided in 25-10-201, *but not attorney fees*, must be paid by the party who resisted the revocation or out of the property of the decedent, as the court directs.

---

[2]  Verone asserts in her issue statement that the District Court also erred in partially denying her request for costs, but she makes no argument on this point separate from her argument regarding attorney fees.  As such, we do not address the court's partial denial of her costs.

Section 72-12-206, MCA (emphasis added). In contrast, a personal representative who "defends or prosecutes a proceeding in good faith, whether successful or not . . . is entitled to receive from the estate the personal representative's necessary expenses and disbursements, including reasonable attorney fees incurred." Section 72-3-632, MCA.

¶87    As an initial matter, the court correctly interpreted the meaning of § 72-12-206, MCA. This Court has rarely applied or interpreted this statute, which long predates Montana's adoption of the Uniform Probate Code (UPC). The UPC does not appear to contain a corollary provision. The statute's history does suggest, however, that it has always required that only a successful "defender" of a will in contest—and not a successful "contestant"—may recover attorney fees. *See In re Kesl's Estate*, 117 Mont. 377, 161 P.2d 641 (1945) (concluding that an earlier version of this statute, Section 10047, R.C.M. (1935), required that the party who unsuccessfully contests a will must pay attorney fees, but that the party who unsuccessfully defends a will need only pay costs). The Montana Legislature most recently amended § 72-12-206, MCA, in 1993 to include language that if a will challenge is successful and probate is revoked, costs, "but not attorney fees," must be paid by the party who defended the will. 1993 Mont. Laws 1835. The history of this statute makes clear that if a party successfully contests a will, she is entitled to costs, but not attorney fees, whereas if a party successfully defends a will, she is entitled to both attorney fees and costs.

¶88    On the record of this case, however, the District Court's determination that § 72-12-206, MCA, barred Verone's claim for attorney fees was incorrect. *Mlekush*, ¶ 8.

31

This case involved a petition for probate of a will and a cross-petition for probate of an earlier will. The personal representative remained a "neutral third party" and did not defend the validity of either will. Had Suenram defended either of these wills, he would have been entitled to fees from the Estate under § 72-3-632, MCA. But because the appointed personal representative did not advocate for one of these wills over the other, § 72-3-632, MCA, does not apply.

¶89    As discussed earlier, the court and the parties treated the case from the beginning as a contest between two competing wills. The court described in an order the "competing petitions" for probate of the 2012 Will and the 2010 Will and stated that it "must determine the validity of the competing wills." The court correctly determined that Verone contested the 2012 Will and that Schulz and Degel defended it. But, as reflected in the pleadings and in the Final Pretrial Order, Schulz and Degel also contested the 2010 Will, and Verone defended it. In the pleadings, Schulz denied Verone's contention that the 2010 Will represented "the last valid dispositional intentions of Helen Edwards." In the Final Pretrial Order, Schulz and Degel took the position that the 2012 Will revoked the 2010 Will, and they listed as an issue of law whether the 2010 Will should be admitted to probate.

¶90    Once the jury issued its verdict, the District Court should have admitted the 2010 Will to probate as a matter of law. At that point, § 72-12-206, MCA, would have applied to the 2010 Will, because that will would have been a "will in probate" that was "confirmed." Because Verone successfully defended that will, the statute did not bar her from seeking attorney fees that she "incurred in defending the validity or probate" of the 2010 Will. Section 72-12-206, MCA. The District Court thus erred in determining that

Verone was statutorily barred from recovering attorney fees. *Mlekush*, ¶ 8. The amount of any fees to which Verone may be entitled for her defense of the 2010 Will is a matter for review and determination by the District Court. We remand for further proceedings on Verone's request for attorney fees.

## CONCLUSION

¶91 We affirm the District Court's appointment of Suenram as a neutral personal representative, the court's three evidentiary rulings that Schulz appealed, and the jury's special verdict finding "undue influence, fraud, or duress." We reverse the court's decision not to admit the 2010 Will to probate or to validate the 2010 Trust and its denial of Verone's request for attorney fees. We remand with instructions that the court initiate probate proceedings of the 2010 Will and for further proceedings on Verone's request for attorney fees, consistent with this Opinion.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ MICHAEL E WHEAT